261 Md. 387 (1971)
275 A.2d 478
BALTIMORE PLANNING COMMISSION
v.
VICTOR DEVELOPMENT CO., INC.
[No. 365, September Term, 1970.]
Court of Appeals of Maryland.
Decided April 8, 1971.
The cause was argued before BARNES, McWILLIAMS, FINAN, SINGLEY and SMITH, JJ.
Ambrose T. Hartman, Deputy City Solicitor, and John N. Spector, Assistant City Solicitor, with whom were George L. Russell, Jr., City Solicitor, and Clayton A. Dietrich, Chief Assistant Solicitor, on the brief, for appellant.
John Martin Jones, Jr., with whom was Robert E. Young on the brief, for appellee.
McWILLIAMS, J., delivered the opinion of the Court.
In the spring of 1964 the appellee[1] (Victor) acquired a 12 acre parcel of land in a purlieu of Baltimore City known as Morrell Park both then and now zoned to permit the erection thereon of 40 residential apartment units to the acre. Just when the project to be known as the Morrell Park Apartments was conceived we are unable to say but it is clear that the planning stage was well along by late 1969. The "Preliminary Plan" was approved by the Planning Commission (Commission) on 9 January *389 1970. "Final development and subdivision plans," filed on 2 February, received Commission approval on 6 February. Virtually essential to the financing of such a project is the procurement from the Federal Housing Administration (FHA) of a commitment that it will insure the repayment of money borrowed to construct the buildings. On 18 April the FHA issued its commitment to insure the repayment of a construction loan but only if Victor could obtain a building permit from the Department of Housing and Community Development on or before 24 September 1970.
In response to a request made by the Department of Public Works Victor made some changes in its development plan and on 18 June it filed with the Commission a "revised final development plan." Approval followed on 10 July. On 5 August the "revised final subdivision plan"[2] was filed. On 14 August the Commission rejected the "revised final subdivision plan" and rescinded its prior approval of the "revised final development plan." The action of the Commission precluded the issuance of a building permit without which, of course, the FHA commitment would soon expire. The only reason given by the Commission was that "construction and occupancy of the proposed * * * apartments would cause an increase in local school population, thus causing public schools in the area of the planned subdivision to become overcrowded."[3]
*390 Although the record is silent in this regard it seems safe to assume that Victor went all out to persuade the Commission to recede from its position. Failing in this and spurred by the loom of the 24 September expiration date of the FHA commitment Victor, on 15 September, filed in the Baltimore City court its petition for the writ of mandamus claiming:
"That the Commission has no power or authority under the Baltimore City Charter, or under any other statute, charter, ordinance or rule of law, to refuse to grant approval of a final subdivision or development plan on the grounds that the development of a subdivision will have an adverse impact upon public schools in the area of said subdivision.
"That the actions of the Commission in refusing to approve Petitioner's revised final subdivision plan and in attempting to rescind its approval of Petitioner's revised final development plan are illegal, without justification, without authority, and hence arbitrary and erroneous, *391 for the reason that the revised final subdivision and development plans filed by the Petitioner comply in each and every respect with the requirements of the Baltimore City Charter (1964 Revision) and with all of the rules and regulations, lawfully adopted by the Commission under said Charter."
The city solicitor, obviously uncomfortable at being thrust into the role of advocatus diaboli, answered the petition and prayed its dismissal. Victor, on 23 September, moved for a summary judgment. Following an informal hearing on 24 September the trial judge, Cardin, J., granted the motion and ordered the issuance of the writ of mandamus. The Commission's order for appeal was filed the same day.[4]
It is entirely clear, we think, that the amendments of 24 April 1970 to the Rules and Regulations of the Commission were not offered in evidence, that they were not mentioned, directly or indirectly, by either of the parties, that they were not a factor in the discussions before the trial judge, and that counsel were unaware of their existence. Argument is hardly required to sustain the notion that they are no part of the case before us. Gordon v. State National Bank of Bethesda, 249 Md. 378 (1968).
We think it is clear, also, that the Commission can exercise only those powers granted to it by virtue of the Charter of Baltimore City (1964 Revision). Article VII, Section 78, empowers the Commission to
"* * * formulate and publish rules and regulations for the development of such subdivisions *392 which will require that the development plans include adequate provision for all public improvements, enterprises and all public utilities, whether privately or publicly owned or operated; for the proper width, grade and arrangement of streets, and all uses of land for public transportation, and the relation thereof to public streets; for adequate and convenient open spaces for traffic and the access of fire-fighting apparatus; for proper drainage; and which will require that all such subdivisions and the owners thereof comply in all respects with any applicable Official Detailed Plan." (Emphasis added.)
Section 80 of Article VII states the further provision:
"All plans for such subdivision of land shall be filed for record with the Commission, and no permits shall be issued by any department of the City for any work of any character whatsoever, to be done in such subdivision of land, until the plan thereof shall have been approved by the Commission as in conformity with the rules and regulations formulated and published by the Commission and with any applicable Official Detailed Plan." (Emphasis added.)
It would be appropriate to observe at this point that there is no "Official Detailed Plan" applicable to Morrell Park. Municipal agencies can exercise only so much of the police power as may be expressly granted or necessarily implied. If the action taken exceeds that power, the action is void. Baltimore County v. Security Mortgage Corp., 227 Md. 234 (1961); State v. Mott, 61 Md. 297 (1884). The power delegated to the Commission to formulate and publish rules and regulations is not a blank check; it cannot make ad hoc decisions which deny to a citizen the right to use his land lawfully. Not only must its rules and regulations be conformable with its grant *393 of authority, it must itself be bound by those very same rules and regulations. We see nothing in Article VII, Section 78, dealing, even remotely, with schools or the school population. The city solicitor advised the Commission that "there is neither an ordinance nor a regulatory code which provides a legal requirement or standard which relates local public school population to proposed private subdivision plans." Since there was no disavowal of his statement we shall assume it is factually accurate.
The Commission argues, wistfully to be sure, that Section 78, supra, does permit a consideration of the extent to which Victor's project may put an additional burden on the schools in the vicinity, citing the clause "and shall formulate and publish rules and regulations for the development of such subdivisions which will require adequate provision for all public improvements, enterprises and public utilities, whether privately or publicly owned and operated." The observation which comes to mind immediately is that the excerpt from Section 78 does nothing more than empower the Commission to formulate and publish rules and regulations. We can infer that some rules and regulations have been formulated and published but this record does not tell us what they are. Obviously they do not deal with the impact of projects upon the schools, otherwise there would have been no reason for the purported 24 April amendments. Indeed, in light of the mention (in Section 78) of such specific items as "the proper width, grade and arrangements of streets, * * * access for fire-fighting apparatus * * * [and] proper drainage," there is some question that the Commission has the power to formulate a rule dealing with the effect of subdivisions upon schools. However, since it is not required of us we express no opinion in this regard.
There is little doubt that the developer can be required to deal with the problems he creates in his own subdivision but there is even less doubt that he cannot be saddled with the resolution of problems common to the area and for which he is no more responsible than other citizens. *394 In Baltimore County v. Security Mortgage Corp., supra, the county sought to require a developer to share the cost of building a bridge on other land and when he refused the county withheld approval of his plats. We held that "in the absence of an enforceable contract or statutory authority * * * [a county] cannot, as a prerequisite to approval of a subdivision plat require a developer or owner to defray the cost and expense of land improvements which lie beyond * * * [his] property and are on land owned by others." Id. at 239. See also County Comm'rs of Anne Arundel County v. Ward, 186 Md. 330 (1946); Stubbs v. Scott, 127 Md. 86 (1915); State v. Mott, supra.
Similar situations have arisen in other jurisdictions. Consistently it has been held that, unless the submitted plan clearly fails to comply with the appropriate legislative regulations, the board in question must grant its approval. In Daley Constr. Co. v. Planning Board of Randolph, 340 Mass. 149, 163 N.E.2d 27 (1959) the court held that the board did not have the authority to reject a plan because the new development would have a detrimental effect on the area water supply where the plan in all other respects conformed with the express regulations of the Board. In Beach v. Planning and Zoning Commission, 141 Conn. 79, 103 A.2d 814 (1954), the submitted plan was rejected because of the anticipated adverse effect on the locality's public school facilities, police protection, and general fiscal condition. The court made it clear that these were not valid considerations under the existing enabling act, but that even if they were, such regulation would be improper without strict standards to guide the board, saying:
"It does not contain any specific provisions granting the commission authority to reject a subdivision application on the ground that the development of the subdivision will increase the town's burden of providing schools, roads and police and fire protection or on the ground that *395 the financial condition of the town is such that it will not sustain an increased burden. The plan submitted by the plaintiff complied with the regulations which had been adopted." 103 A.2d at 816.
See also Kling v. City Council of City of Newport Beach, 155 Cal. App.2d 309, 317 P.2d 708 (1957); Rosen v. Village of Downers Grove, 19 Ill.2d 448, 167 N.E.2d 230 (1960); Longridge Builders, Inc. v. Planning Board of Township of Princeton, 52 N.J. 348, 245 A.2d 336 (1968).
Victor contends, and there seems to be no dispute about it, that its submission complied in all respects with the rules, regulations and requirements which were properly before Judge Cardin. In the circumstances we cannot say Judge Cardin erred in ordering the issuance of the writ of mandamus. The city solicitor concluded his brief by stating that he
"* * * has attempted to present the pertinent differences between * * * [himself] and the majority of the Planning Commission and [that he] submits the matter for the decision of this Honorable Court so that * * * [the Commission and Victor] might be guided accordingly."
The city solicitor also felt "obliged to bring to the Court's attention" Renz v. Bonfield Holding Co., 223 Md. 34, 42 (1960), and Rosen v. Village of Downers Grove, supra. We have read those cases but we see in them little if any support for the position of the Commission.
Order affirmed.
Costs to be paid by the appellant.
NOTES
[1] Baltimore Contractors, Inc., a related corporation, was the actual grantee.
[2] Baltimore City Charter (1964 Rev.), Art. VII, § 79, defines "Subdivision Plan" as "* * * a plan submitted by the owner of not less than one-third of the land included therein showing one or more new streets or parks, or showing the division of a lot, tract or parcel of land into two or more lots, tracts or parcels, or other divisions of land for the purpose, whether immediate or future, of sale or building development."
[3] The language quoted is from Victor's "Petition for Mandamus." Neither the text of the Commission's minutes nor its order is in the record. We note with some astonishment that in a letter to the Commission, dated 29 July, the city solicitor laid it down rather firmly that

"the Planning Commission * * * is [not] vested with the legal power to refuse to approve a housing subdivision plan or issue a building permit in connection therewith to a private developer if it be determined that as a result of such housing, the public schools in the immediate vicinity would become overcrowded."
This unwelcome advice the Commission resolutely ignored, perhaps because on 24 April 1970 it had added to its "Rules and Regulations for Land Subdivision" the following:
"Subdivision Procedure  b. Procedure  4. Consider development only on property where the use will be compatible with the capacity of public community facilities to service the contemplated use. The subdivider should therefore examine with the Department of Planning the location, character and availability of such public facilities as sewerage, water supply, schools, street access, and recreational facilities."
"Subdivision Procedure  Community Facilities  3.0-12. All residential plans submitted to the Planning Commission, Preliminary or Final, will be referred to the Baltimore City Department of Education, for advisory report and recommendation. The Department of Education will determine the projected school population anticipated from the subject development, and compare the future school-age population to existing and proposed school capacities in determining whether that agency can endorse the development." (Emphases added.)
Victor emphasizes, and it is true, that the April additions quoted above are not in the record. We have quoted from the Commission's brief. Curiously, the Commission seems to have been unmindful of its new rules when it approved Victor's "revised final development plan" on 10 July. Indeed the city solicitor was unaware of their existence on 29 July 1970 and, we were told, as late as the time of the hearing before Judge Cardin.
[4] The questions whether mandamus was the appropriate remedy and whether the Commission has standing to pursue this appeal were not raised below and, in the circumstances, we think it is unnecessary to consider them. In respect of the latter it is of course quite clear that had Victor taken an appeal to the Baltimore City court, the Commission, by itself, would have been without standing here. Board of Liquor License Comm'rs of Baltimore City v. Leone, 249 Md. 263 (1968); Maryland Board of Pharmacy v. Peco, Inc., 234 Md. 200 (1964); Board of Zoning Appeals v. McKinney, 174 Md. 551 (1938).