## BOARD OF COUNTY COMMISSIONERS OF CECIL COUNTY *v.* GERALD GASTER ET AL.

[No. 82, September Term, 1978.]

*Decided May 29, 1979.*

234

*Motion for reconsideration filed July 18, 1979; denied July 19, 1979.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, ORTH, COLE and DAVIDSON, JJ.

*John C. Murphy* for appellant.

*Mark Pollak,* with whom were *Piper & Marbury* on the brief, for appellees.

SMITH, J., delivered the opinion of the Court.

We granted certiorari in this case in order that we might consider the question of whether a county planning commission acting under subdivision regulations adopted by the county's legislative body might properly disapprove establishment of a proposed subdivision which met all zoning requirements but failed to comply with the master plan, also adopted by the county's legislative body. Since we conclude that approval of the subdivision plan was properly denied, we shall reverse.

Cecil County (the county) is located in the northeast corner of Maryland, at the head of the Chesapeake Bay, on the east side of the Susquehanna River and immediately adjacent to the States of Delaware and Pennsylvania. It has a land area of 352 square miles and a 1970 population of 53,291 people. It is cut in two by the Chesapeake and Delaware Canal. The Northeast, Elk, and Bohemia Rivers, all of which are navigable, separate parts of the county from other parts. It is traversed by two major highways running from the Baltimore metropolitan area to other populous areas of the Northeast. Because of their close proximity, portions of the county may be called a bedroom community for Wilmington, Delaware, and Philadelphia, Pennsylvania. Wilmington is situated in New Castle County, the northernmost of the three Delaware counties. Cecil County's numerous miles of waterfront are inviting to many people in the Wilmington and Philadelphia metropolitan areas. Indeed, it was said by the engineers for appellees in a letter of transmittal to the county's planner:

> [W]e feel that the project should be considered in terms of growth potential for Cecil County. Residents would be located within easy commuting distance of available jobs in both Cecil and New Castle Counties. Additionally, the project represents the creation of a recreation-oriented community unavailable in the majority of housing developments.

Appellees, Gerald Gaster et al. (Gaster), own a tract of land comprising 174.3 acres located between Oldfield Point Road and the Elk River in what is known as Elk Neck. The area

in question is zoned "Shoreline Recreational-Residential Zone R-R." It is located in the same election district as Elkton, the county seat.

Gaster presented to the Cecil County Planning Commission (the commission) a preliminary subdivision plan for what he called "Chesapeake Coves." He contemplated development of 408 lots for single-family dwelling units, together with associated roads, water and sewer facilities, and recreational areas. The commission notified Gaster that it "ha[d] disapproved said plat as not being in conformance with the Cecil County Subdivision Regulations." It went on to say:

> The Commission's disapproval is based primarily on the following:
>
> 1. A purpose of the Subdivision Regulations (Section 1.1) is to legislate the intent of the County's Comprehensive Plan by providing for substantial conformance to the Plan. The Planning Office is required by the Subdivision Regulations to check the Preliminary Plat as to its substantial conformity with the Plan (Section 4.1.7) and the Planning Commission must review the Plat with regard to such conformity (Section 4.1.9). The Commission also reviews the Plat in light of the impact on existing and proposed roads and the feasibility of a subdivision in the area with regard to total number and size of lots and effect on the school district (Section 4.1.21).
>
> 2. The Preliminary Plat of Chesapeake Coves specifies a density of 2.3 units per acre, whereas the Comprehensive Plan indicates that residential developments in the subject area "may be approved for density up to 1.0 units per acre". Therefore the Chesapeake Coves Preliminary Plat cannot be said to meet the substantial conformance requirements of the Subdivision Regulations.
>
> 3. Neither is the substantial conformance

requirement met with respect to the Plan's provision that access to and from development tracts shall be through roads having capacity and alignments sufficient to protect public safety. The addition of more than 400 dwelling units represented by Chesapeake Coves would mean a 73% increase in traffic on Oldfield Point Road, which has poor vertical and horizontal alignment, poor sight distances, and narrow width. This road is not programmed for reconstruction before 1990.

4. Finally, review of the Preliminary Plat in accordance with the provision in the Subdivision Regulations requiring consideration of impact on the school district concluded that the increased school enrollment from Chesapeake Coves would be beyond the capacity of the schools to absorb.

Gaster appealed to the Cecil County Board of Appeals, as the commission advised him he might do. It reversed. It found the conclusions of the commission were "factually correct and would be sufficient to defeat [the] appeal if they were, in fact, applicable to the development in question." It explained:

The Board finds, therefore, that in so far as the regulations of the Planning Commission permit the rejection of a subdivision plan on the grounds herein above stated, the same exceed the authority given by the enabling act and are consequently invalid.

The Planning Commission argues, however, that the provisions of 3.08 of Article 66B when read in conjunction with the provisions of Section 3.2 of the Subdivision Regulations, permits the Board to reject the subdivision on grounds of non-compliance with the presently existing Cecil County Master Plan. The Board feels that the short answer to this contention is the fact that while the Master Plan constitutes a useful, effective, and necessary guideline in the

planning and zoning area, it does not have statutory effect until implemented by the Zoning Ordinance. The Board does not feel that the Master Plan can be used to override the existing criteria as set forth by the Cecil County Zoning Ordinance for the R-R zone in which the subdivision is located and with which criteria the subdivision complies in its entirety.

The commission and the Board of County Commissioners of Cecil County appealed to the Circuit Court for Cecil County. Upon motion of Gaster, the trial judge dismissed the appeal of the commission for lack of standing to take the appeal, but denied a similar motion as to the county commissioners.

Relying in part upon *Balto. Plan. Comm'n v. Victor Dev.,* 261 Md. 387, 275 A. 2d 478 (1971), about which we shall have more to say later, the trial judge affirmed the action of the appeal board, saying:

It is conceded that as presently zoned, 2.3 units per acre as contemplated under the Preliminary Plat of Chesapeake Coves is permissible. The comprehensive plan would limit density in this development to 1.0 unit per acre. The Zoning of this land was established by an ordinance duly passed and adopted by the County Commissioners of Cecil County. This is a legislative function which the Commissioners by law are authorized to perform. The Planning Commission has no such authority. To permit it to adopt a regulation under which it could nullify a valid zoning ordinance would make the zoning ordinance of this county meaningless. Persons purchasing property for development, aware of the zoning in effect, would do so at their peril. It certainly was never intended that the Planning Commission should be permitted to usurp the legislative function of the County Commissioners in zoning matters, and in this case it has exceeded its authority in attempting to do so.

This appeal on behalf of Cecil County followed. We granted the county's petition for the writ of certiorari prior to the

hearing of this case by the Court of Special Appeals because of the importance of this issue in planning matters involving non-charter counties in Maryland.

Before we get into the legal background for this particular controversy, a word should be said relative to planning and zoning generally. Zoning did not come into Maryland easily. *Compare Tighe v. Osborne,* 149 Md. 349, 368, 131 A. 801 (1925), and *Goldman v. Crowther,* 147 Md. 282, 309, 128 A. 50 (1925), each holding a Baltimore City zoning ordinance invalid, *with Jack Lewis, Inc. v. Baltimore,* 164 Md. 146, 160, 164 A. 220 (1933), and *Tighe v. Osborne,* 150 Md. 452, 466, 133 A. 465 (1926), each upholding such an ordinance. Prior to the enactment of Chapter 672 of the Acts of 1970, planning and zoning authority for non-charter counties (in the absence of a local law as to a specific county) was found in Maryland Code (1957) Art. 66B, §§ 10-37, originally enacted by Chapter 599 of the Acts of 1933. It was based on the Standard State Zoning Enabling Act recommended by the U. S. Department of Commerce in the 1920's. Maryland Planning and Zoning Law Study Commission, *Final Report* 18 (1969). In it provision was made for a planning commission which was granted the power to prepare and adopt a master plan. No approval of the plan by the local legislative body was required. Once such a plan had been adopted, then under § 18 "no street, square, park or other public way, ground, or open space, or public building or structure, or public utility, whether publicly or privately owned, [was permitted to] be constructed or authorized in the municipality [, a term defined in § 10 as including or relating to counties,] or in such planned section and district until the location, character, and extent thereof sh[ould] have been submitted to and approved by the commission . . . ." By §§ 21 to 23 power was granted the local legislative body of counties to adopt zoning regulations. Title 3, found in §§ 24 to 30, provided for subdivision control. By § 25 whenever a major street plan had been adopted and a copy duly filed "in the office of the county clerk," then no plat of a subdivision within the territory was to be filed or recorded until it had been approved by the chairman or secretary of the planning commission. Section 26 provided

that before exercising those powers the planning commission was to prepare regulations governing the subdivision of land within its jurisdiction, which regulations were to provide for the proper arrangements of streets in relation to other existing planned streets in the master plan, for adequate and convenient open spaces for traffic, utilities, access of fire fighting apparatus, recreation, light and air, and for the avoidance of congestion of population, including minimum width and area of lots.

Chapter 672 of the Acts of 1970 came as a result of the report of the Maryland Planning and Zoning Law Study Commission, to which we have previously referred. The sections applicable to this proceeding are found without relevant change in Code (1957, 1978 Repl. Vol.) Art. 66B, §§ 3.01 — 7.05.

Section 3.05 concerns the general powers and duties of the planning commission. It was revised somewhat from the language found in its predecessor, § 15. Under the earlier provision the planning commission was "to make and adopt a master plan . . . ." Now it is "to make and approve a plan which shall be recommended to the local legislative body for adoption . . . ." Moreover, the new § 3.05 is more precise and more demanding than its predecessor. It directs that the plan contain certain elements, including a land use element "which shall show proposals for the most appropriate and desirable patterns for the general location, character, extent and interrelationship of the manner in which the community should use its public and private land at specified times as far into the future as is reasonable"; a transportation element showing "proposals for the most appropriate and desirable patterns for the general location, character, and extent of the channels, routes, and terminals for transportation facilities, and for the circulation of persons and goods at specified times as far into the future as is reasonable"; a community facilities element showing "proposals for the most appropriate and desirable patterns for the general location, character, and extent of public and semipublic buildings, land, and facilities for specified times as far into the future as is reasonable," and "the planning commission's recommendation for land

development regulations to implement the plan ....''
Additional permitted elements include, but are not limited to,
"community renewal, housing, flood control, pollution,
conservation, natural resources, the general location and
extent of public utilities, and other programs which, in the
judgment of the planning commission will further advance
the purposes of the plan.'' That section specifically provides,
"In order that a county ... may avail itself of the zoning
powers conferred by this article, it shall be the duty of the
planning commission to recommend the boundaries of the
various original districts and appropriate regulations to be
enforced therein.''

The Maryland Planning and Zoning Study Commission in
its final report said concerning § 3.05:

> This section is designed to assert the full force of
> the plan as being the foundation upon which zoning,
> subdivision, and other land use regulatory devices
> shall be constructed. The various elements of the
> plan are set out clearly, thus providing an
> understanding of the contents of the plan. By
> requiring these various elements to be interrelated
> the plan develops the comprehensiveness necessary
> to establish land use regulatory devices. [*Id.* at 25.]

The purpose of a master plan is set forth in § 3.06:

> The plan shall be made with the general purpose of
> guiding and accomplishing the coordinated,
> adjusted, and harmonious development of the
> jurisdiction, and its environs which will, in
> accordance with present and future needs, best
> promote health, safety, morals, order, convenience,
> prosperity, and general welfare, as well as efficiency
> and economy in the process of development;
> including among other things, adequate provisions
> for traffic, the promotion of public safety, adequate
> provision for light and air, conservation of natural
> resources, the prevention of environmental
> pollution, the promotion of the healthful and
> convenient distribution of population, the promotion

of good civic design and arrangement, wise and efficient expenditure of public funds, and the adequate provision of public utilities and other public requirements.

The procedure to be followed for a planning commission to recommend adoption of a master plan is found in § 3.07. After the required hearings it must certify "[a]n attested copy of the plan or part of the plan . . . to the local legislative body." Section 3.08 provides that after adoption of the plan by the local legislative body "no street, square, park or other public way, ground, or open space, or public building or structure, or public utility, whether public or privately owned, shall be constructed or authorized in the jurisdiction . . . until the location, character, and extent of such development shall have been submitted to and approved by the commission *as consistent with the plan* . . . ." (Emphasis added.)

Zoning powers are contained in §§ 4.01 — 4.08. However, § 4.07 requiring the legislative body to provide for the appointment of a board of appeals grants to such a board authority "[t]o hear and decide appeals where it is alleged that there is error in any order, requirement, decision, or determination made by an administrative official in the enforcement of this article or of any ordinance adopted pursuant thereto." It was under this section that the appeal from the action of the planning commission was entered, since § 3.3 of the Cecil County subdivision regulations provides:

Any person aggrieved by any action of the Planning Commission pursuant to these regulations may appeal in accordance with the provisions of Article 66B, Section 4.07, paragraph e of the Code of Public General Laws of Maryland.[1]

---

1. As proposed by the Maryland Planning and Zoning Law Study Commission, the jurisdiction of the board of appeals would have been applicable not to a matter arising under "this article," as appears in present § 4.07, but to one under "this subtitle," the zoning subtitle. We have considerable doubt as to whether the commission is "an administrative official," and thus whether an appeal in this matter properly could lie to the board of appeals. The term "an administrative official" seems to connote an individual, not a group of individuals. However, no argument has been presented to us on this subject.

The provisions relative to subdivision control are contained in §§ 5.01 — 5.08. The county argues that the 1970 amendments to Art. 66B require enactment of subdivision regulations which would implement the master plan and that avoidance of congestion of population is one of the permitted purposes of subdivision regulations. Gaster says that "the accuracy of that argument is not supportable by either the law or the legislative history." We disagree. Section 5.02 provides that when a local legislative body shall have adopted the transportation element of the plan of the territory within its jurisdiction and shall have duly filed a copy of the plan in the office of the clerk of the circuit court, "then no plat of a subdivision of land within such territory or part shall be filed or recorded until it shall have been approved by the planning commission and such approval entered in writing on the plat by the chairman or secretary of the commission." Then § 5.03 (a) goes on to provide:

> Before exercising the powers referred to in § 5.02, the planning commission shall prepare regulations governing the subdivision of land within its jurisdiction. Those regulations may provide for the adequate control of shore erosion; the control of sediment and the protection from flooding; the proper arrangement of streets in relation to other existing planned streets and to the master plan; the adequate and convenient placement of public school sites and of open spaces for traffic, utilities, access of fire-fighting apparatus, recreation, light and air and the avoidance of congestion of population, including minimum width and area of lots.

As enacted by Chapter 672 of the Acts of 1970 this section read, "Such regulations may provide for adequate shore erosion control, . . . for adequate and convenient open spaces for traffic, . . . light and air, and for the avoidance of congestion of population, including minimum width and area of lots." This section was twice amended in 1971. The first amendment was by Chapter 237, proposed by Senate Bill 392. It was enacted on April 8, 1971. Its purpose as stated in its

title was "to include public school sites in the list of those areas for which provision may be made by zoning regulations, and to clarify the language therein." By it this section was amended to read, "Those regulations may provide for the adequate control of shore erosion; ... the adequate and convenient placement of public school sites and of open spaces for traffic, ... light and air and the avoidance of congestion of population, including minimum width and area of lots." The second amendment was by Chapter 793, proposed in House Bill 1304 and enacted April 9, 1971. Its title specified its purpose was to repeal and reenact a number of sections, including § 5.03, "to correct certain erroneous references and language therein." It said, "Such regulations may provide for adequate shore erosion control, ... for adequate and convenient open spaces for traffic, ... light and air, and for the avoidance of congestion of population, including minimum width and area of lots." This section was again amended by Chapter 131 of the Acts of 1972. Its title stated its purpose to be for "correcting certain errors in the laws relating generally to zoning and planning." This time the language was repeated as it appears today. There is not even a suggestion in the title of these amendments of an intent to change that for which the subdivision regulations were to be prepared.

We believe the second section of § 5.03 (a) should be read as follows:

These regulations may provide for

1. the adequate control of shore erosion;
2. the control of sediment and the protection from flooding;
3. the proper arrangement of streets in relation to other existing planned streets and to the master plan;
4. the adequate and convenient placement
   (a) of public school sites and
   (b) of open spaces for
      (1) traffic,
      (2) utilities,

(3) access of fire-fighting apparatus,

(4) recreation,

(5) light and air and

5. the avoidance of congestion of population, including minimum width and area of lots.

The clause "the avoidance of congestion . . ." does not relate to "the adequate and convenient placement of . . . open spaces."

Section 5.03 (c) provides for submission of the proposed subdivision regulations to the local legislative body for adoption and that when they shall have been "adopted by the local legislative body, a copy thereof shall be certified by the commission to the clerk of the circuit court in which the jurisdiction is located for record." It is clear to us that the adoption of subdivision regulations is required once a transportation plan has been adopted and that those regulations are authorized to take into consideration "the avoidance of congestion of population."

Section 5.04 provides that when a planning commission has approved a subdivision plat it "shall by virtue of such approval, be deemed to be an amendment of or an addition to or a detail of the plan and a part thereof." It goes on to provide that the commission may from time to time "recommend to the local legislative body amendments of the zoning ordinance or map or additions thereto to conform to the commission's recommendations for the zoning regulation of the territory comprised within approved subdivisions."

In the argument relative to the apparent conflict between the county's zoning ordinance and the subdivision regulations the parties seem to have lost sight of § 1.2 of the subdivision regulations providing that in any instance where "any provisions of th[o]se regulations conflict with any other provision of law, whether set forth in th[o]se regulations or contained in any restrictions covering any of the same subject matter, that provision which is more restrictive or imposes a higher standard or requirement shall govern. Such determination shall be made by the Planning Commission."

Cecil County, Maryland, Subdivision Regulations § 1.2 (April 15, 1976).

As we noted in *Wash. Co. Taxpayers Ass'n v. Board,* 269 Md. 454, 455-56, 306 A. 2d 539 (1973), some confusion exists relative to the terms planning and zoning, which are not synonymous. Zoning is concerned with the use of property but planning is broader in its concept. 1 E. Yokley, *Zoning Law and Practice* § 1-2 (4th ed. 1978) comments:

> Expressing the matter in another way, let us say that zoning is almost exclusively concerned with use regulation, whereas planning is a broader term and indicates the development of a community, not only with respect to the uses of lands and buildings, but also with respect to streets, parks, civic beauty, industrial and commercial undertakings, residential developments and such other matters affecting the public convenience and welfare as may be properly embraced within the police power. [*Id.* at 4.]

There are three integral parts of adequate land planning, the master plan, zoning, and subdivision regulations. The need for subdivision regulations as a part of that planning is well illustrated by the case here. As it is put in 4 R. Anderson, *American Law of Zoning* § 23.03 (2d ed. 1977), "[Z]oning ordinances are not calculated to protect the community from the financial loss which may result from imperfect development. Some of these purposes are sought through the imposition of subdivision controls." *Id.* at 47. 4 A. Rathkopf, *The Law of Zoning and Planning* Ch. 71 § 2 (4th ed. 1979), gives reasons for subdivision control:

> Planning enabling acts and the requirements for plat approval are based upon the realization that homes are no longer generally constructed one at a time for individual owners, resulting in a gradual development which can be controlled by zoning ordinances and local health, building, plumbing, and electrical codes alone. Vacant lots suitable for single homes in already developed communities have all but disappeared. The great increases in population and

the unprecedented demand for homes has necessarily resulted in opening up undeveloped land in outlying areas, and the development thereof by large numbers of homes which may be said to be built all at one time. Where such development takes place without restriction other than zoning restrictions, it is the developer who designs the community in respect to the number, length, width, condition, and location of streets. The developer also determines where the newly arrived inhabitants of the community shall reside, without consideration of the necessity for, or existence of, schools, fire protection, parks, playgrounds, and other public facilities. If subdivisions develop too rapidly, or before the community is ready for the added burdens which an increased population imposes, and without adequate control, the result too often is the creation of deteriorating neighborhoods which create a blight upon the community and a drain upon the municipal purse. [*Id.* at 71-6 — 7.]

*See also* 82 Am. Jur. 2d, *Zoning and Planning* § 163 (1976).

The numerous cases upon which Gaster relies are inapposite. Each has arisen in another context, under a different statutory scheme. For instance, the trial judge relied on *Balto. Plan. Comm'n v. Victor Dev.,* 261 Md. 387, to which we have alluded. The Baltimore City Planning Commission there denied approval for a subdivision plan because of its impact on local schools. We held this denial was improper because there was no statutory authority for the commission's action. The numerous cases such as *Chapman v. Montgomery County,* 259 Md. 641, 649, 271 A. 2d 156 (1970), holding that a provision of a zoning ordinance would prevail over a conflicting section of a master plan likewise have arisen in different contexts under different statutes.

The case most nearly analogous to the one at bar is *Krieger v. Planning Commission,* 224 Md. 320, 167 A. 2d 885 (1961). There a planning commission created under a public local law denied approval of a subdivision plan because it failed to take

into consideration the fact that a road abutting the property in question was designated as a "primary road," to have a minimum width of 100 feet. Judge Henderson said for the Court, "Since the classification is reasonable and no abuse of discretion is shown, there is no violation of constitutional principle." *Id.* at 326. *Cf. Hoyert v. Bd. of County Comm'rs,* 262 Md. 667, 674, 278 A. 2d 588 (1971), where we held that a county could not refuse to rezone to a higher classification that portion of a tract in the line of a proposed extension of Kenilworth Avenue simply to keep down the price of ultimate acquisition for such road purposes.

When Cecil County adopted its zoning regulations providing for rural zones and for lot sizes and density in such zones it was not contemplating that all undeveloped area would become developed area. The county simply was specifying the size of lot it regarded as compatible with the rural zone. It might well have specified a smaller sized lot but for the fact that the necessity for driving a well and providing adequate sewage disposal through a septic tank system dictates a certain minimum size. It was not contemplated that numerous homes would be built, yet had the county provided in a rural area that no homes could be built other than on a farm it then would have been impossible for a farmer to convey out a lot to his son or daughter. On the other hand, had the county required a very substantial sized lot as a minimum, *e.g.* five or ten acres, it would have been guilty of poor land use, of failing to carefully husband one of our irreplaceable and disappearing natural resources, namely, land devoted to agricultural production.

The General Assembly certainly contemplated some change from the previously existing scheme of planning and zoning when it decreed that in the counties covered by Art. 66B approval of the master plan by the local legislative body was required and that subdivision regulations should be adopted by such body. How can a county effectively plan for capital expenditures for roads, schools, sewers, and water facilities if, without regard to preexisting plans, a developer, as proposed here, might place a settlement of 1,200 or more people in the middle of a previously undeveloped area, a

settlement which would overtax school facilities and which would necessitate improvement of a road whose reconstruction had not been contemplated before 1990? Planning would be futile in such situations.

In those instances the developer, not the constituted authority of the county, is in control of planning for the future of the county. Surely, this was not contemplated by the General Assembly when relative to the master plan it repeatedly used the words "at specified times as far into the future as is reasonable" and then went on to mandate approval of the master plan by the local legislative body and to require the adoption of subdivision regulations.

It is the county legislative body, the County Commissioners of Cecil County in this instance, which, pursuant to legislative authority, adopted the master plan, the zoning regulations, and the subdivision regulations, a fact which seems to have been overlooked by the trial judge. In the case at bar we see no basic conflict between the zoning regulations and the subdivision regulations. If there were a conflict, the subdivision ordinance in this instance provides that the more restrictive provision shall prevail. Moreover, Art. 66B, § 3.08 specifies that once a master plan has been adopted by the local legislative body "no street ... shall be constructed or authorized ... until the location, character, and extent of such development shall have been submitted to and approved by the commission *as consistent with the plan* ...." (Emphasis added.) It must be remembered that the board of appeals found the factual conclusions of the commission to be correct. Thus, it follows that if this proposed subdivision were approved, the streets contemplated in it would be spewing traffic out onto a county road "which has poor vertical and horizontal alignment, poor sight distances, and narrow width [, a] road ... not programmed for reconstruction before 1990." Given the provisions of § 3.08, this in itself was a sufficient basis for the disapproval of the subdivision plat by the commission.

Subdivision regulations perhaps have a certain analogy to special exceptions to which the floating zone concept has been likened in this Court's discussion in such cases as *Bigenho v.*

*Montgomery County,* 248 Md. 386, 391, 237 A. 2d 53 (1968); *Board v. Turf Valley,* 247 Md. 556, 561-62, 233 A. 2d 753 (1967); and *The Chatham Corp. v. Beltram,* 243 Md. 138, 149-50, 220 A. 2d 589 (1966). The county here has preordained by its subdivision regulations that one who seeks to cut up a larger tract by creating a subdivision must not disrupt the master plan and that the subdivision must be compatible with that master plan. Likewise, many zoning ordinances specify relative to special exceptions that they shall be granted only if they are compatible with and will not disrupt the master plan.

In sum, Cecil County has validly used the planning tools placed in its hands by the General Assembly to provide for orderly growth for the county.

> *Judgment reversed and case remanded to the Circuit Court for Cecil County for passage of an order consistent with this opinion; appellees to pay the costs.*