489 A.2d 76

**Carol MILLER, et al.**

v.

**FORTY WEST BUILDERS, INC.**

**No. 947, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

March 14, 1985.

**322**

John V. Murphy, Baltimore, for appellants.

Thomas B. McCarty, Baltimore, for appellee.

Argued before MOYLAN, BISHOP and GARRITY, JJ.

BISHOP, Judge.

Carol Miller and the members of the Rollingwood Improvement Association appeal the decision of the Circuit Court for Baltimore County which affirmed, on appeal, approval by the Board of Appeals (the Board) of a plan of development for the Rollingbrook subdivision. Md.Ann. Code art. 25A § 5(U) (1981); Charter of Baltimore County § 604 (Baltimore County Code 1978);[1] *see also* Charter

---

1. Charter Section 604 provides that a party aggrieved by a decision of the circuit court "may appeal such decision to the court of appeals of this state." The phrase "court of appeals" is used as a generic term and not to refer only to the Court of Appeals of Maryland. *See* Md.Ann.Code art. 25A § 5(U) (1981); *see also* Md.Cts. & Jud.Proc. Code Ann. § 12–308 (1984).

Section 602(a) (1983 Cum.Supp.). (Powers of board; appeals from orders relating to zoning).

## FACTS

Appellants reside in the community adjacent to the unimproved tract of land upon which appellee, Forty West Builders, Inc., proposes a development consisting of seven individual single-family homes, and twelve row homes. Appellee intends to build the individual homes directly next to appellants existing community of individual, single-family homes, and between that existing community and the proposed row homes. Road access to the new development would be through the existing community. Although Frederick Road, a state maintained roadway, borders on a portion of the proposed subdivision, access from the proposed subdivision to Frederick Road is not possible because of the adverse position of the State Highway Administration. Sewage would be handled by the nearby pumping station which is presently operating over its capacity.

Appellee's proposed subdivision plan was reviewed under the Development Regulations of Baltimore County, Baltimore County Code (B.C.C.) § 22–37 *et seq.* (1983 Cum. Supp.), which require, subject to certain exceptions not at issue here, an "approved plan ... for all development and a plat ... for any subdivision." B.C.C. § 22–53 (1983 Cum. Supp.). Development includes "subdivision" which is defined as:

The division of property into two (2) or more lots, or the combination of lots, parcels, tracts, or other units of property previously divided, for the purpose, whether immediate or future, of sale, rental or building development.

B.C.C. § 22–39 (1983 Cum.Supp.).

On August 5, 1982, at a public meeting attended by representatives of appellants, appellee and several govern-

mental agencies, the County Review Group (C.R.G.)[2] approved appellee's plan. B.C.C. § 22–58 (1983 Cum.Supp.) Pursuant to B.C.C. § 22–61 (1983 Cum.Supp.), appellants challenged this decision before the Board, which affirmed the decision. Appellants then appealed the Board's decision to the circuit court pursuant to § 604 of the Charter of Baltimore County (1978). The circuit court affirmed the Board's decision.

Appellants now contend that:

I. The Board was arbitrary and capricious in approving the plan which fails to provide for the required buffer strip between the proposed development and the existing adjacent community;

II. The Board erred by not remanding the plan to the Planning Board as required by B.C.C. § 22–59 (1983 Cum. Supp.) because a dispute exists regarding the location of roads, and also because the plan involves a cluster subdivision; and

III. The C.R.G. was arbitrary and capricious in approving the plan because the proposed development poses health, safety, and welfare dangers to the existing community.

### Standard of Review

■ This case arises from the C.R.G.'s approval of appellee's subdivision plan and is, therefore, subject to the standard of review outlined in B.C.C. § 22–61(c) (1983 Cum. Supp.) regarding appeals to the Board:

> The final action on a plan shall be presumed correct and the person aggrieved shall have the burden of persuasion to show that such action was arbitrary or capricious, procured by fraud, or otherwise illegal.

---

**2.** B.C.C. § 22–57(a) (1983 Cum.Supp.) provides that "[t]he C.R.G. consists of the directors of the department of public works and office of planning and zoning or their designated representatives."

*See* Charter of Baltimore County § 604 (1978) (on appeal, the circuit court "shall have power to affirm the decision of the board, or, if such decision is not in accordance with law, to modify or reverse such decision, with or without remanding the case for rehearing, as justice may require."). This is in accord with the standard of review established by case law regarding zoning actions. *See e.g. Klein v. Colonial Pipeline Co.,* 55 Md.App. 324, 337, 462 A.2d 546, *cert. denied,* 297 Md. 418 (1983).

■ Appellants' contention, that this standard conflicts with the Baltimore County Charter Section 603 which requires *de novo* hearings before the Board, ignores the plain language of the section that "[a]ll hearings held by the board shall be heard *de novo unless otherwise provided by legislative act of the County Council...."* (emphasis added). There is also no merit to appellants' contention that there is no reasonable basis for applying the standard because the C.R.G. is not required to maintain a record. B.C.C. § 22–58 (1983 Cum.Supp.) requires the C.R.G. to "summarize the action taken, in writing, as a permanent part of the plan file...." The record of the C.R.G.'s approval of appellee's plan summarizing what transpired at the meeting, setting out the issues raised, the resolution of conflicts and the action taken, provides sufficient material against which the standard may be applied.

### Discussion

Because the tract of land at issue is a part of a Density Residential zone which lies within 300 feet of a dwelling, other than an apartment building, it is subject to certain use restrictions as a "residential transition area" Baltimore County Zoning Regulations (B.C.Z.R.) § 1B01.1–B.1.a.1(a) (1981, 1982 Rev.). Among the restrictions in effect when the C.R.G. considered appellee's plan was B.C.Z.R. § 1B01.-1–B.1.b.3(b) (1981):

A buffer area shall be provided between any new use and any abutting residential lot line that is in a residential transition area and that exists at the time the proposed

use is to be established. The buffer area may not be less than 50 feet in width if the front or side of any building faces the lot line, or 75 feet in width if the rear of any building faces the lot line or the new use is a parking lot.[3]

In addition, B.C.Z.R. § 1B01–B.1.b.5 (1981) provided that

(a) The purpose of the buffer area requirement is to provide a method of screening a proposed residential transition use from any existing dwelling or lot in a residential transition area. In order to accomplish that purpose, the buffer area shall consist of vegetation or woodland, at least 70% of which shall be evergreen trees of a minimum height of 6 feet, and 10% of which shall be shrubs of a minimum spread of 15 inches. The buffer area shall contain one tree or shrub for each 3 feet of the boundary of the buffer area.

(b) No other uses are permitted within the buffer area, except walkways, site landscaping, and other similar site amenities.

(c) If a portion of the requirement can be met with existing vegetation or woodland, the existing vegetation or woodland may be supplemented in a manner acceptable to the Planning Board, the Zoning Commissioner, or the Board of Appeals, as the case may be.[4]

Finally, B.C.Z.R. § 1B01.1–B.1.c (1981) provided that the "buffer area" requirements do not apply to:

1. A proposed dwelling to be placed in a residential transition area containing existing dwellings of the same

---

**3.** This was amended by Bill No. 109, 1982, effective August 26, 1982, to provide that:

> A buffer area shall be provided and situated so as to effectively screen off-site dwellings, yard areas, and vacant lots of two (2) acres or less in area, that lie within 300 feet of a proposed building or parking lot. The buffer area may not be less than 50 feet in width if the front or side of any proposed building faces the lot line, or not less than 75 feet in width if the rear of any proposed building faces the lot line or the new use is a parking lot.

**4.** This was also amended by Bill No. 109, 1982, which changed the minimum contents requirements and permitted additional uses in the buffer area.

type, or, if two or more types of dwellings exist, a proposed dwelling of the same type as the existing dwelling with the fewest number of dwelling units. Such dwellings shall be governed by the applicable laws, zoning regulations and policies otherwise applicable. As used herein, a "dwelling of the same type" means a dwelling which has the same or a lesser number of dwelling units and party walls as the existing dwelling units.

2. Public utility uses (except public utility service centers and storage yards). Such uses shall be governed by the provisions of sections 411, 502 and such other applicable sections of these regulations.

3. Notwithstanding the provisions of Section 104, the reconstruction of an existing church, community building, or other structure devoted to civic, social, recreational, fraternal, or educational activity which is destroyed by fire or other casualty. However, such reconstruction may not increase the size of ground floor area of the structure or alter the location or use of the structure.

4. Shoreline fishing and shellfish facilities. Such uses shall be governed by the provisions of Section 500.4 and subparagraphs 1A01.2.C.9, 1A02.2B.10, 1A04.2.B.7, and 1B01.1C.7A of these regulations.[5]

Bill No. 109, 1982, which took effect on August 26, 1982, made the first numbered paragraph above, "dwelling of the same type," subject to B.C.Z.R. § 1B01.1–B1.b.3.(d) (1981, 1982 Rev.) which was added by the same bill and which provided, in pertinent part, that the buffer zone requirement, B.C.Z.R. § 1B01.1–B.1.b.3.(b), is

not affected by the placement of a dwelling or dwellings of the same type between the new use and the residential lot line or off-site dwelling or lot, if any portion of the tract proposed to be developed includes a proposed use which is dissimilar to the existing dwellings in the resi-

---

**5.** Several other exceptions were added when this provision was amended by Bill No. 109, 1982.

dential transition area. In such cases, the buffer area shall be provided between the new use and the dissimilar use.

Twenty-one days before the effective date of Bill 109, 1982, the C.R.G. applied the pre-amended restrictions, as interpreted by Zoning Commissioner Hammond, and approved appellee's plan which appellants contend did not provide for a "buffer area." Zoning Commissioner Hammond in a letter to the Director of the Office of Planning and Zoning concluded that the plan satisfied the regulations because the seven individual homes provide the same screening effect of dissimilar uses as the other uses which are expected from the "buffer area" requirement.

The restrictions, as amended by Bill No. 109, 1982, were in effect when the Board considered the plan on appeal. The Board concluded, however, that the pre-amended restrictions applied and affirmed the C.R.G.'s determination that appellee's plan satisfied the "buffer area" requirements of the pre-amended regulations.

## I.

Appellants' contention regarding the buffer area requirement presents two questions:

A. Whether approval of appellee's plan is subject to the restrictions as amended by Bill No. 109, 1982, which took effect after the C.R.G. approved the plan but before the Board considered it on appeal; and if not,

B. Whether the plan satisfied the "similar type of dwelling" exception to the "buffer area" requirements of the pre-amended regulations.

## A.

Maryland consistently has followed the rule that "an appellate court is bound to decide a case according to existing laws, even though a judgment rightful when rendered by the court below should be reversed as a consequence...." "[A] change in the law after a deci-

sion below and before final decision by the appellate Court will be applied by that Court unless vested or accrued substantive rights would be disturbed or unless the legislature shows a contrary intent. . . .

The rule has been applied in zoning cases.

*Yorkdale v. Powell,* 237 Md. 121, 124, 205 A.2d 269 (1964) (citations omitted).

■ Appellee did not acquire vested or substantive rights by obtaining C.R.G. approval of the subdivision plan. In *Yorkdale,* the Court stated that

an applicant for rezoning to a more intense use of his property, who has been successful before the zoning authorities and the circuit court does not acquire a vested or substantive right which may not be wiped out by legislation which takes effect during the pendency in this Court of the appeal from the actions below.

237 Md. at 126, 205 A.2d 269.

The Board and the Circuit Court determined, however, that the County Council did not intend Bill No. 109, 1982 to apply in cases like the one *sub judice* where the plans satisfied the pre-amended regulations and were submitted for approval prior to June 30, 1982. Specifically, they relied upon the language of the bill that its restrictions regarding residential transition areas "do not apply to . . . [a]ny zoning petition prepared in accordance with . . . [the pre-amended provisions] and filed prior to June 30, 1982." B.C.Z.R. § 1B01.1–B.1.c.11 (1981, 1982 Rev.).

Appellants argue that submitting subdivision plans for approval does not constitute the filing of a "zoning petition," a term which is not defined by the Code, zoning regulations, or any Maryland case. Rather, the argument continues, zoning and subdivision control are separate and distinct functions, governed by different articles of the Code, Title 22, articles III and IV, respectively. "Zoning petition," appellants conclude, refers only to petitions for

reclassification, special exemption, or variance under the zoning article. *See* B.C.C. §§ 22–26, 2–58.1 (1983 Cum. Supp.).

The cardinal rule of statutory interpretation is to determine the intent of the legislature and to do this a court looks first to the language of the statute. *Ryder Truck Lines v. Kennedy,* 296 Md. 528, 535 [463 A.2d 850] (1983). If that language is ambiguous or unclear, a court must use other tools to discover the legislative intent or purpose. 296 Md. at 536 [463 A.2d 850].

*Public Service Commission v. Baltimore Gas & Electric,* 60 Md.App. 495, 508, 483 A.2d 796 (1984).

■ The phrase "zoning petition" is not clear and unambiguous. The County Council did not define those words and as the arguments in this case demonstrate, it could be interpreted very narrowly, as appellants contend, or more broadly, as appellee responds. We have found the phrase used only one other time in the zoning regulations, in B.C.Z.R. § 500.7, which indicates that the term should be interpreted more broadly than appellants suggest:

With respect to any zoning petition other than a petition for a special exception, variance, or reclassification, the Zoning Commissioner shall schedule a public hearing for a date not less than 30 days after the petition is accepted for filing.

The word petition is used several times in the regulations with reference to various applications thereunder. *See e.g.* B.C.Z.R. §§ 500.2, 500.7 (1981). Accordingly, we will examine this language within the context of the zoning regulations taken as a whole, and the purposes of those provisions.

"In its ordinary sense a petition is a written request to a board for action on some matter therein laid before it." *McKillop v. County Bd. of Ed. of Sanborn County,* 78

S.D. 587, 105 N.W.2d 671, 675 (1960).[6]  See generally Black's Law Dictionary (5th ed. 1979) at p. 1031 which defines petition as

A written address, embodying an application or prayer from the person or persons preferring it, to the power, body, or person to whom it is presented, for the exercise of his or their authority in the redress of some wrong, or the grant of some favor, privilege, or license.

There is no real dispute that submitting subdivision plans to the C.R.G. for approval pursuant to the Development Regulations for Baltimore County constitutes a petition. The controversy here focuses on the use of the word "zoning" and the distinction between zoning and subdivision control.

The Court of Appeals has defined zoning, and in doing so has also recognized the distinction between planning and zoning. *See e.g. Board v. Stephans*, 286 Md. 384, 388–90, 408 A.2d 1017 (1979); *Board of County Comm'rs. v. Gaster*, 285 Md. 233, 246–47, 401 A.2d 666 (1979); *Wash. Co. Taxpayers Ass'n v. Board*, 269 Md. 454, 455–56, 306 A.2d 539 (1973). In *Gaster*, the Court stated that

some confusion exists relative to the terms planning and zoning, which are not synonymous. Zoning is concerned with the use of property but planning is broader in its concept. 1 E. Yokley, *Zoning Law and Practice* § 1–2 (4th ed. 1978) comments:

---

**6.** Rule 9.b of the Board of Appeals Rules of Practice and Procedure, approved by the County Council by B.C.C. § 2–58 (1983 Cum.Supp.), provides:

  b.  Definition of Petition. As used herein the term "petition" shall mean:

    1.  Request for reclassification of property, including all material filed with said request.

    2.  Request for special exceptions and/or variances, the granting of which are dependent upon a reclassification of the property in question, including all material filed therewith.

B.C.C.App. C Rule 9.b (1983 Cum.Supp.). This Rule, however, is titled as a "[s]pecial rule pertaining to original petitions for reclassification, special exception and/or variances," and expressly applies only to these petitions, Rule 9.a.

Expressing the matter in another way, let us say that zoning is almost exclusively concerned with use regulation, whereas planning is a broader term and indicates the development of a community not only with respect to the uses of lands and buildings, but also with respect to streets, parks, civic beauty, industrial and commercial undertakings, residential developments and such other matters affecting the public convenience and welfare as may be properly embraced within the police power. [Id. at 4.]

There are three integral parts of adequate land planning, the master plan, zoning, and subdivision regulations. 285 Md. at 246, 401 A.2d 666.

■ Although this case arose within the context of approval of a subdivision plan, under the Development Review and Approval Process Division of the Development Regulations of Baltimore County, B.C.C. § 22–53 *et seq.*, Article IV, Division 2 (1983 Cum.Supp.), it also involves zoning. Accordingly, we hold that the term "zoning petition" was intended to be broad enough to include subdivision plans submitted to the C.R.G. for approval.

Approval by the C.R.G. will necessarily entail review of and compliance with the applicable zoning regulations. B.C.C. § 22–55(10) (1983 Cum.Supp.) requires that the plan contain information regarding "[c]urrent zoning of the subject property and surrounding properties, including the location of any residential transition areas...." In addition, Section 22–50(30) provides that "[i]n the case of a plan involving a use in a residential transition area," the plan must contain

    (i) The residential transition area and existing and proposed uses therein;

    (ii) The height and width of elevation of proposed buildings;

    (iii) Proposed building setbacks and the distance between principal buildings;

    (iv) Existing and proposed vegetation and buffer areas;

(v) Existing and proposed lighting.

Finally, Section 22–55 requires that the plan contain numerous other items of information which implicitly and explicitly involve zoning. Sections 22–53 and 58 which require the C.R.G. to act on the plan implicitly, if not explicitly, involve the C.R.G. in the administration of the zoning regulations, including the amended bill at issue here.

In discussing the effect of zoning on subdivision control, 1 Yokley, Zoning Law and Practice § 17–10 (1979) provides that

> Enactments in the field of zoning and subdivision control are necessarily related to each other and they should be read and considered together in order to ascertain the full meaning and import of each.
>
> .    .    .    .    .
>
> A subdivider, seeking approval of a subdivision plat, must first meet applicable zoning regulations and then must comply with state and county subdivision regulations. Thus, where a preliminary plat indicates on its face that it is violative of zoning ordinances, the denial of approval of the plat will be sustained.

*Id.* at 86–87. See also 4 Anderson, American Law of Zoning § 23–21 (1977) which states that

> While the zoning power and authority to review plats are separate, it seems clear that plats should not be approved which violate existing zoning regulations. There is little to be said for approving a plat, for example, which discloses substandard lots. Such an approval would be a disservice to the developer who would be unable to build on the lots, and it would encourage deviation from those portions of the comprehensive plan which are implemented by the zoning regulations in issue. Some of the enabling acts specifically require that a plat comply with the zoning regulations of the municipality.

*Id.* at 91.

Furthermore, the controversy in the case *sub judice* surrounds the zoning regulations, specifically, compliance

with the buffer area requirements of B.C.Z.R. § 1B01.1–B.1.b.3.b. (1981, 1982 Rev.). It does not arise under the subdivision regulations contained in, or enacted pursuant to, B.C.C. § 22–80 *et seq.* (1983 Cum.Supp.), the General Design Standards and Requirements Division of the Development Regulations.

The County Council undoubtedly employed the phrase "zoning petition" in order to encompass the many different methods by which zoning regulations are administered, and the many types of documents which are submitted for approval to secure compliance with those regulations. *See e.g.* B.C.Z.R. § 500.1 (building permits); B.C.Z.R. § 500.4 (use permits); B.C.Z.R. § 500.7 (petition regarding non-conforming uses); B.C.Z.R. § 500.5 and B.C.C. § 22–26 (special exceptions); B.C.C. § 22–26 (variances); B.C.C. § 2–58.1 (reclassification).

■ Since the requirement that a developer submit subdivision plans to the C.R.G. for approval is designed, in part, to assure compliance with the zoning regulations, we hold that the County Council intended the phrase "zoning petition" to encompass the act of submitting those plans. Appellee submitted its plan prior to June 30, 1982, and, therefore, "filed" a "zoning petition" within the meaning of that exception. Accordingly, the plan must comply with the pre-amended restrictions, but is not subject to Bill No. 109, 1982.

### B.

In his letter opinion, the zoning commissioner approved appellee's plan because it placed the same type of dwelling in the buffer area which, he concluded, provided the same screening effect of dissimilar uses as the other uses which negate the buffer area requirements under B.C.Z.R. § 1B01.1–B.1.c. (1981). Appellee suggests that our standard of review is quite limited and that we should defer to this interpretation which was adopted by the C.R.G., the Board, and the circuit court.

The Court responded to a similar argument in *Balto. Bldg. Constr. Trades v. Barnes*, 290 Md. 9, 427 A.2d 979 (1981) as follows:

We pay great deference to findings of fact of an administrative agency since it has heard and observed the witnesses. Here, however, the review is one of law. It is true that ... the view taken of a statute by administrative officials soon after its passage is strong, persuasive influence in determining the judicial construction and should not be disregarded except for the strongest and most urgent reasons. However, ... "[W]here the language is plain and unambiguous, the judicial construction cannot be controlled by extraneous considerations. No custom, however venerable, can nullify the plain meaning and purpose of a statute."

290 Md. at 14–15, 427 A.2d 979 (citations omitted).

In the case *sub judice,* appellee proposes to develop a residential transition area and must, therefore, provide the defined buffer area between the new use and any abutting lot line that exists in the residential transition area, or come within one of the stated exceptions. The plan did not provide for a buffer area which was required to "consist of vegetation or woodland," of at least 70% evergreen trees and 10% shurbs. B.C.Z.R. § 1B01.1–B.1.b.5(a) (1981). "No other uses ... [were] permitted within the buffer area, except walkways, site landscaping, and other similar amenities." B.C.Z.R. § 1B01.1–B.1.b.5(b) (1981).

The plan does not satisfy the "similar type of dwelling" exception, which provides that the buffer area requirements do not apply to proposed dwellings to be placed in a residential transition area containing existing dwellings of the same type, defined as "a dwelling which has the same or lesser number of dwelling units." B.C.Z.R. § 1B01.1–B.1.c.1 (1981). Appellee proposes to place both single-family individual homes and row homes in the residential transition area established by and containing existing single-family individual homes. The buffer area requirements, therefore, do not apply to the proposed single-family individual

homes of the same type as the existing dwellings, but do apply to the row homes which are not a similar type.

■ There is no basis for extending the exceptions to the buffer area requirements beyond the three additional ones provided by the County Council: public utility uses, reconstruction of certain designated non-conforming uses, and shoreline fishing and shellfish facilities, B.C.Z.R. § 1B01.1–B.1.c.2–4 (1981). The zoning commissioner appears to have adopted a variation on the rule of cy-pres[7] to conclude that appellee's plan provides for the "same screening effect of dissimilar uses from those uses to which the screening benefits inure in the same way and to the same extent as" the other uses which negate the buffer area requirements, the exceptions contained in B.C.Z.R. § 1B01.1–B.1.c. (1981). We do not agree.

■ First, "[w]here a statute expressly provides for certain exclusions, others should not be" read into it by implication. *Jennings v. Gov't. Employees Ins. Co.*, 302 Md. 352, 359–360, 488 A.2d 166, 169–170 (1985) *quoting Pennsylvania Nat'l Mut. v. Gartelman*, 288 Md. 151, 156, 416 A.2d 734 (1980); *Department v. Greyhound*, 247 Md. 662, 668, 234 A.2d 255 (1967); *quoting State Insurance v. Nationwide*, 241 Md. 108, 117, 215 A.2d 749 (1966). If the legislature intends other exclusions, it could easily expressly add them to the existing ones. *Greyhound*, 247 Md. at 668, 234 A.2d 255.

■ Furthermore, the zoning commissioner's analysis presupposes that the buffer area exceptions are so designated because they provide a screening effect for dissimilar uses. They are, however, simply designated uses for which no buffer area is required. Finally, appellee's plan may provide a screening effect for the existing dwellings in the adjacent community, but it does not do so for the vacant

---

7. The rule of cy-pres is a rule for the construction of charitable trust, by which the intention of the party is carried out as near as may be, when it would be impossible or illegal to give it literal effect.

residential lots which are located in the residential transition area. The buffer area requirement was also intended to provide a method of screening for them. *See* 1B01.1–B.1.b.5(a) (1981).

Contrary to the zoning commissioner's conclusion, the legislative history of the restrictions in residential transition areas is consistent with these determinations. Bill No. 100, 1970, which contained the restrictions for residential transition areas prior to the enactment of the regulations at issue here, limited development of residential transition areas in most density residential zones to dwellings similar to those which established the residential transition area.

The regulations at issue here liberalized the uses permitted in a residential transition area by allowing virtually any use permitted in a density residential zone, including dissimilar uses. B.C.Z.R. § B01.1–B.1.a.2. and B.1.b. (1981). In doing so, however, the regulations subjected development in the residential transition area to certain restrictions, including the buffer area requirement.

The similar type of dwelling exception simply permits the same uses in the residential transition area which were permitted under Bill No. 100, 1970. Since appellee's plan would not have satisfied that bill, it does not satisfy the regulations at issue here because it does not provide for a buffer area.

The zoning commissioner relied upon the bill's purpose to provide for liberalization of uses in the residential transition area and concluded that rejecting appellee's plan would be contrary to that purpose. This analysis, however, overlooks the second aspect of these regulations—the restrictions imposed upon such development. Liberalization of uses is permitted only within the context of the specifically defined restrictions imposed by the regulations. B.C.Z.R. § 1B01.1–B.1.b (1981). Contrary to the intent of the County Council, the zoning commissioner's interpretation would permit virtually unrestricted development in a residential transition area as long as one of the excepted uses, however large,

existed or was placed between the proposed dissimilar use and the existing one.

Since appellee's subdivision plan did not satisfy the applicable zoning requirements, the C.R.G.'s action in approving the plan was not in conformance with law. We reverse and remand the case to the circuit court with directions to reverse the determination made by the Board to approve the plan. For future guidance, we will address the other two issues raised by appellants.

## II.

There is no merit to appellant's contentions that the C.R.G. should have referred the plan to the Planning Board pursuant to B.C.C. § 22–59(a) (1983 Cum.Supp.) which states, in pertinent part, that

the C.R.G. shall refer the plan to the planning board in the following circumstances:

.    .    .    .    .

(2) A dispute exists concerning the location of streets which connect the property which is the subject of the plan to adjoining properties or streets; or

(5) The plan involves a cluster subdivision.

## A.

No "dispute" exists regarding the location of streets even though, as appellants contend, they attended the C.R.G. meeting and urged that road access for the proposed subdivision be directly onto Frederick Road rather than through the existing community. Section 22–59(a) was designed to address those situations in which a dispute regarding access roads arises between the concerned government agencies, *see* B.C.C. § 22–57 (1983 Cum.Supp.), and the developer. It does not require referral to the Planning Board where nearby residents disagree with the developer, C.R.G., the County Traffic Engineering Department and the State Highway Administration all of which agree as to the location of those roads.

Although "any person" is permitted to attend C.R.G. meetings and "to comment" on proposed plans, such persons do not *ipso facto* have the right to require referral of the plan to the Planning Board. The term "dispute" connotes a disagreement between the parties to the development approval process which, under the development regulations, includes only the developer and the concerned governmental agencies.

### B.

■ Appellee's plan does not involve a "cluster subdivision" which is defined by B.C.C. § 22–39 (1983 Cum.Supp.) as "a residential development of land in a D.R. 1 or D.R. 2 zone involving the building of residential housing other than single-family detached houses." Although a portion of appellee's tract is in a D.R. 2 zone, it is undisputed that only single-family individual homes are proposed in that zone, and that the row homes are proposed on a portion of that tract which is a D.R. 5.5 zone. Since the development proposed in the D.R. 2 zone does not involve housing other than single-family detached houses, appellee's plan does not involve a cluster subdivision.

### III.

Also, we find no merit to appellant's contention that the C.R.G.'s action approving the plan was arbitrary and capricious because the sewerage pumping station which would serve the new subdivision is presently operating over capacity and the overflow poses significant health and safety hazards. The C.R.G. determined that the developer must have a study done and pursuant to a public works agreement must make any necessary corrections to eliminate any overflow.

■ The General Design Standards and requirements regarding sewerage provides that

Proposed public or private sewerage facilities must be designed and located to function safely and without dan-

ger of contaminating groundwater, surface water, or public or private water supplies.

B.C.C. § 22–87 (1983 Cum.Supp.). Appellee's plan does not conflict with this general requirement since it involves the *upgrading* of *existing* sewerage facilities which are apparently otherwise properly designed and located. Furthermore, pursuant to the C.R.G.'s determination, the public works agreement is the mechanism to assure that the facilities are properly improved so that the proposed subdivision poses no health or safety hazards to the existing community. Accordingly, the C.R.G.'s action approving the plan subject to upgrading of the sewerage facilities was not arbitrary and capricious.

JUDGMENT REVERSED, CASE REMANDED; COSTS TO BE PAID BY APPELLEE.