DANIEL JOSEPH LUCADO *v.* STATE OF MARYLAND

[No. 1075, September Term, 1977.]

*Decided July 13, 1978.*

The cause was argued before THOMPSON, LISS and WILNER, JJ.

*George E. Burns, Jr., Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Alexander L. Cummings, Assistant Attorney General,* with whom were *Francis Bill Burch, Attorney General, Charles E. Wehland, State's Attorney for Howard County,* and *Ronald Spahn, Assistant State's Attorney for Howard County,* on the brief, for appellee.

WILNER, J., delivered the opinion of the Court.

Appellant and a co-defendant were charged with a first-degree sexual offense, robbery, kidnapping, and a number of related offenses. A jury in the Circuit Court for Howard County convicted appellant of a sexual offense in the first degree, robbery, and battery, for which he was sentenced to four years' imprisonment.[1]

All of this emanated from an incident occurring in the early morning hours of August 22, 1976, involving one K.D., then 18 years of age. Mr. D testified that, at about 1:00 a.m., he

---

1. The sentence was four years for the sexual offense, four years for robbery, and one year for battery, all concurrent.

was on "the Block" (for the uninitiated, this is an "adult entertainment" strip of several blocks along East Baltimore Street in Baltimore City), waiting for two friends whom he had arranged to meet. He had expectations of starting a new job promising a substantial increase in income, and wanted to celebrate. While strolling down the street, appellant approached him and engaged him in conversation — "started talking about the Block and whores and buying them, and things like that." Suddenly, appellant grabbed his arm, forced him into a car, pushed his head down, and threatened him with what Mr. D claimed was a knife. The co-defendant, Charles Linton, was sitting in the driver's seat, and immediately drove off.

According to Mr. D, they drove into the country and stopped at a church: "[W]hen we stopped, they kept telling me we were going to a whorehouse, and they pointed to a big church, and they said it was a whorehouse, that's where I was going to die that night." D fled from the car, but was captured and forced to return, whereupon they drove to another spot. At this point, appellant forced D to remove his pants and to perform fellatio, at the conclusion of which appellant and Linton changed places, and D was forced to perform the same act on Linton. During this ordeal, D was periodically struck by the assailants, and his wallet, containing over $150, and a watch were taken. Appellant, in addition, attempted to have anal intercourse with D. When all of this had ended, D was forced from the car and nearly killed when appellant swung at him with a tire iron. Linton persuaded appellant to desist in this effort, at which point, D was placed back in the car, driven around for a while and finally let go. As the assailants drove off, D noticed part of the license number, which he gave to the police.

During cross-examination of D, both defense counsel intimated, through their questioning, that D was a homosexual, that he initiated the sexual activity, and that he enjoyed what happened to him. D unequivocally denied such suggestions. That this would be the principal line of defense became clear when appellant testified on his own behalf. He admitted being on "the Block" with Linton on the evening

in question, but claimed that D initiated the conversation, voluntarily got into the car, and initiated the sexual contact — first with Linton and then with appellant. All allegations of force, coercion, and brutality were denied, as were the explicit acts testified to by D. Appellant claimed that D had grabbed him — "started messing around with me, and I pushed him away." The clear, unmistakable import of appellant's testimony was that D was homosexual and had initiated everything that occurred in the car. Linton, who also testified, gave essentially the same story; he also charged D with initiating all of the episodes of fellatio and attempted anal intercourse.

At the close of the case for the defense, the State advised the court (and defense counsel) that it had one rebuttal witness — Mr. D's uncle, who would testify as to "the non-homosexuality of Mr. [D]." The legal theory for admitting such testimony, according to the State, was that, "where consent is made a part of the defense . . . the State has the right, in rebuttal, to prove that he is not, there was not consent, that this was not the kind of person that consented. The question of homosexuality — they've accused him of being a homosexual." Appellant's counsel objected on the ground that "the uncle is not competent to prove that homosexuality or lack thereof . . .". The objection was overruled, and the State then produced Police Sergeant Luberecki, D's uncle. Sergeant Luberecki testified, without further objection, that he had known D all of his (D's) life, that he had no reputation for being a homosexual, that Luberecki knew of no instances of homosexual activity on D's part, and that D had never before been accused of being a homosexual. Both defense counsel briefly cross-examined Luberecki. No motion to strike any of the testimony was made.

In this appeal, appellant raises one question: Did the trial judge err in permitting testimony as to the victim's alleged lack of reputation as a homosexual? He contends, of course, that there was error, and grounds his assertion on Md. Annot. Code art. 27, § 461A, the pertinent part of which provides that "[e]vidence relating to a victim's reputation for chastity and

opinion evidence relating to a victim's chastity are not admissible in any prosecution for commission of rape or sexual offense in the first or second degree." The thrust of appellant's argument, of course, is that Sgt. Luberecki's testimony to the effect that D was not homosexual and had no reputation for being so amounted to evidence relating to D's "chastity", and was thus precluded under the statute.

Unfortunately, before considering the question of statutory *interpretation* — whether "evidence relating to a victim's chastity" includes evidence relating to a victim's non-homosexuality — we must address the question of statutory *application.* This is made necessary because the particular language in the statute upon which appellant must, of necessity, rely was not the law at the time of his trial. It became effective later.

The legislative history of § 461A brings both questions — application and interpretation — more clearly into focus. This section was originally enacted by Laws of Md., 1976, ch. 574 (House Bill 715), one of two bills emanating from a Special Legislative Committee on Rape and Related Offenses that were passed by the General Assembly in 1976. The other bill (Senate Bill 358) was enacted as Chapter 573.

As originally introduced, House Bill 715 made evidence as to a victim's reputation for chastity inadmissible in "any prosecution for commission of a sexual offense." The use of the phrase "sexual offense" had clear reference to the provisions of the companion bill — Senate Bill 358 — which, in its first reader form, repealed the common law crime of rape and the statutory reference to it in art. 27, § 461, and substituted instead four degrees of "sexual offense". Had the Senate Bill been enacted in its introductory form, there would have been no crime of rape — only the four degrees of "sexual offense".

During the legislative process, substantial amendments were made to both bills by the House of Delegates. The main bill — Senate Bill 358 — was amended to put back into the bill (and therefore the law) the crime of rape. What are now §§ 462 and 463 were added to the bill, defining and making criminal first and second degree rape, and "vaginal

intercourse" was excluded from the definition of "sexual act", which was the basis for the newly created "sexual offenses". The clear and unmistakable intent of these amendments was to reinstate rape, in its two degrees, as a crime separate and apart from the new sexual offenses. Corresponding amendments were made to House Bill 715. Whereas, as noted, the bill originally excluded evidence pertaining to chastity in prosecutions for a "sexual offense", as amended, the words "sexual offense" were stricken, and the word "rape" substituted.

When the bill passed over to the Senate, an attempt was made to restore it nearly to its original form. Amendments were added that would have made the bill, and thus the exclusionary rule, applicable to both rape and sexual offenses; however, a day later, the bill was reconsidered and all of those Senate amendments were withdrawn.[2] The bill then passed, and was signed into law, with the limiting amendments placed on it by the House of Delegates.

As enacted, a deliberate change had been made in the bill. Fully aware of the amendments made to the companion Senate Bill 358 making (or keeping) criminal both rape and the other sexual offenses, the General Assembly explicitly limited the scope of the House Bill's exclusionary rule to prosecutions for rape. Both bills took effect July 1, 1976.

In its 1977 session, the General Assembly enacted Laws of Md., 1977, ch. 294, which expressly made § 461A applicable to prosecutions for sexual offenses in the first or second degree. However, that bill did not take effect until July 1, 1977. Appellant was tried in May, 1977, when only the provisions of the 1976 enactment were in effect.[3] Appellant having been charged with a sexual offense, and not with rape, it is apparent that, even if § 461A were to be construed in the manner desired by appellant, it would not have precluded the admission of Sgt. Luberecki's testimony at the time it was offered; and, had appellant objected to the testimony on that basis, the objection would have been properly overruled.

---

2. *See* 1976 Senate Journal, pp. 3074, 3075, 3202, 3203.

3. In fact, ch. 294 was not signed by the Governor until the day after appellant's trial had concluded.

Since the 1977 amendment is in effect now, however, the question is whether we must apply it retrospectively. The Court of Appeals has told us that we must do exactly that. In *Janda v. General Motors,* 237 Md. 161 (1964), the Court said, at page 169:

"A statute which affects or controls a matter still in litigation when it became law will be applied by the court reviewing the case at the time the statute takes effect although it was not yet law when the decision appealed from was rendered, even if matters of claims of substance (not constitutionally protected), as distinguished from matters procedural or those affecting the remedy are involved, unless the Legislature intended the contrary."

The rationale behind this rule of retrospective application is that, provided no "vested right" or contrary legislative intent is disturbed, it would be anomalous for a court to apply obsolete standards and issue a mandate that is inconsistent with current law. *See Ziffrin v. United States,* 318 U. S. 73 (1943); *Janda, supra.* The Court of Appeals has, on several occasions, applied this rule with respect to post-trial statutory changes that govern or affect the law of evidence — statutes making admissible that which was previously inadmissible or *vice-versa. See, for example, State v. Norwood,* 12 Md. 195 (1858); *Cunningham v. Dwyer,* 23 Md. 219 (1865); *Reynolds v. Furlong,* 10 Md. 318 (1856); *Atwell v. Grant,* 11 Md. 101 (1857). *See also,* Annot., *Appeal — Change of Law Since Decision,* 111 ALR 1317, 1334 (1937). This application of the rule presupposes, of course, the generally accepted principle that vested rights do not accrue in the rules of evidence.[4]

There being no indication in ch. 294 itself, or in its legislative history, that the General Assembly intended it to be applied prospectively only, we are constrained by the force and rationale of *Janda* to give recognition to the law as it

---

4. *See* Sutherland, *Statutory Construction,* § 41.06; Thompson v. Missouri, 171 U. S. 380, 385 (1898); United Securities Corporation v. Bruton, 213 A. 2d 892 (D.C., 1965).

presently exists, and thus to consider appellant's claim in the light of the 1977 enactment.[5]

We therefore will consider the question of whether § 461A, as it presently exists, renders Sgt. Luberecki's testimony inadmissible. Subsection (a) is the relevant part of the statute; it provides:

> "Evidence relating to a victim's reputation for chastity and opinion evidence relating to a victim's chastity are not admissible in any prosecution for commission of a rape or sexual offense in the first or second degree. Evidence of specific instances of the victim's prior sexual conduct may be admitted only if the judge finds the evidence is relevant and is material to a fact in issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value, and if the evidence is:
>
> (1) Evidence of the victim's past sexual conduct with the defendant; or
>
> (2) Evidence of specific instances of sexual activity showing the source or origin of semen, pregnancy, disease, or trauma; or
>
> (3) Evidence which supports a claim that the victim has an ulterior motive in accusing the defendant of the crime; or
>
> (4) Evidence offered for the purpose of impeachment when the prosecutor puts the victim's prior sexual conduct in issue."

This part of the statute does two things. The first sentence flatly and unconditionally excludes opinion evidence relating to a victim's "chastity" and evidence relating to the victim's reputation for "chastity." There are no exceptions to this prohibition, which appears to apply whether the evidence is offered by the prosecution or the defense. The balance of the

---

5. We cannot evade this responsibility by interposing Maryland Rule 1085 upon the premise that the point was not raised or decided below. Obviously, counsel cannot be held to the task of objecting upon a ground that, at the time, did not exist. Rule 1085, in this context, is, of necessity, subservient to and superseded by the procedure compelled by *Janda.*

subsection deals with something quite different — specific instances of the victim's "prior sexual conduct" — evidence of which is admissible under certain conditions. We are concerned here with the first sentence. Sgt. Luberecki's testimony did not relate to or purport to describe specific instances of D's prior sexual conduct, but pertained solely to his reputation. The question, however, is whether it related to D's reputation for "chastity". To answer that question, we are put to the task of defining the word "chastity", or at least determining what the General Assembly of Maryland meant when it used that term in § 461A.

The rule which we apply in making that determination was stated thusly in *Maryland Medical Service, Inc. v. Carver,* 238 Md. 466 (1965): [6]

> "In construing the words used in the statute, this Court will consider them in their natural and ordinary signification; if, however, the words used in the statute are of doubtful meaning, this Court in determining the legislative intent, will consider not only their usual and literal meaning, but their meaning and effect considered in the light of the objectives and purposes of the enactment and the consequences resulting from one meaning rather than another meaning, with the real legislative intent prevailing over the intent indicated by the literal meaning of the words used."

In pursuing our quest for the true meaning of "chastity", we start with Webster, as good an arbiter as any of the "natural and ordinary signification" of words. Webster's New Twentieth Century Dictionary (Unabridged) gives five definitions of the word; namely:

> "1. abstinence from all unlawful sexual activity: said especially of women.
>
> 2. freedom from obscenity, as in language or conversation; decency; modesty.

---

6. *See also* Truitt v. Board of Public Works, 243 Md. 375, 394 (1966); Fairchild Industries v. Maritime Air Service, Ltd., 274 Md. 181 (1975).

3. simple refinement of design; lack of ornateness or excess.

4. purity; unadulterated state; as, the *chastity* of the gospel. [Rare.]

5. celibacy or virginity; sexual continence."

Given these five somewhat varying definitions, it does not appear that there is a single "natural and ordinary signification" of the word, at least not one from which the issue before us may be easily resolved. In terms of whether "chastity" encompasses or refers to the absence of homosexual tendencies, activities, or experiences, the word is of doubtful meaning; and we therefore must attempt to ferret out the legislative intent.

The words "chaste" and "chastity", and the concepts which they purport to describe, have had a more limited meaning and application in the legal or societal setting than the full range of definitions given by Webster would require. They have, instead, been considered and applied almost exclusively in the context of the first and the fifth of these definitions. In the law, these terms have been traditionally used with particular reference to women; indeed, they have been associated with nearly every vestige of the different, and generally unequal, treatment of men and women by the law.[7]

---

7. Numerous examples of this abound. Most of the cases in which courts have been called upon to interpret the words "chaste" or "chastity" have arisen from statutes reflecting a rather obvious societal judgment that a woman's sexual purity was more to be expected, and therefore more to be protected, than that of a man. They have been primarily of three types: statutes making criminal the seduction of an unmarried woman "of previous chaste character" upon promise of marriage, those prohibiting the abduction of such women for the purpose of unlawful sexual intercourse, and those making it tortious to impute unchastity to a woman. Given the restricted scope of these statutes, it is not surprising that, in a judicial setting, the words "chaste" and "chastity" were nearly always associated only with the female of the species. That this is not merely an anachronism from the distant past is evidenced by the fact that Maryland still retains its "slander of chastity" law (Courts article, § 3-501) declaring words spoken falsely and maliciously "touching the character or reputation for chastity of any woman" to be slander. When that statute was recodified in 1973, the Code Revisor suggested, in light of the State "Equal Rights Amendment" (Md. Decl. of Rights, art. 46), that the statute be extended to protect men as well, "who are not protected in cases where their chastity is subjected to slanderous words"; however, despite persistent attempts either to repeal or extend the statute, the General Assembly has decided that the law should continue to protect only the chastity of women. Speaking of these types of "slander of

In dealing with these terms, the courts, with near uniformity, have viewed them in the context of sexual purity. With respect to unmarried women, chastity has been held to require virginity — the complete absence of any history of sexual intercourse with men.[8] Some courts have even suggested, by extension of that requirement, that divorcees (and presumably widows as well) could not be chaste.[9]

The curious paradox of this demanding and clearly chauvinistic view of women and their sexual purity was that, at the same time that the law sought to exalt and protect that status from inappropriate male transgression, it swept away all pretense of privacy in this intimate matter by requiring women, in an open court of law, either to answer directly for or to endure the ordeal of collateral challenges to their morality and prior sexual conduct. The height of this degradation was reached in prosecutions for rape.

chastity" statutes, Prosser states that most courts "have held that an oral imputation of unchastity to a woman is actionable without proof of damage without regard to whether it charges a crime. Such a rule never has been applied to a man since the damage to his reputation is assumed not to be as great." Law of Torts, 4th Ed., § 112, p. 760. *See also* Sauerhoff v. Hearst Corporation, 388 F. Supp. 117 (D. Md., 1974), *vacated on other grounds,* 538 F. 2d 588 (4th Cir., 1976); State v. Sibley, 31 S. W. 1033 (Mo., 1895).

8. *See, for example,* State v. Enloe, 95 So. 650 (La., 1923), where, in dealing with an "abduction" statute, the court approved this jury instruction: "The words 'previous chaste character' mean actual personal virtue; and, in order to convict, it must be established . . . that the prosecutrix was a woman of virtue *and had never had previous sexual intercourse with a man.*" (Emphasis supplied.) *See also* Norman v. State, 230 S. W. 991 (Tex., 1921): "A chaste woman, within the meaning of the law as applied to an unmarried woman, signifies one who has had no carnal knowledge of men"; conversely, "An 'unchaste', unmarried woman is one who has had carnal knowledge of men . . .". Of similar effect, *see* Marshall v. Territory, 101 Pac. 139, 143 (Okl., 1909) "A chaste female" is one that has never had sexual intercourse — who yet retains her virginity."; Woodruff v. State, 101 N. W. 1114 (Neb., 1904); State v. Dacke, 109 Pac. 1050 (Wash., 1910). *Also,* People v. Kehoe, 55 Pac. 911 (Cal., 1898): "Chastity, as here employed, means in the case of an unmarried female, simply that she is virgo intacta. . . ." *Note also* Hoff v. Hoff, 162 Md. 248 (1932), considering unchastity in the context of the "illicit carnal intercourse with another man."

9. *See, for example,* Jennings v. Commonwealth, 63 S. E. 1080 (Va., 1909), in which the Virginia court, dealing with a "seduction" statute, said of divorced women: "They have known man, and, possessed of the knowledge which such intercourse imparts, if chaste, are immune from the seducer's wiles." *Compare,* for a more "enlightened" view, People v. Weinstock, 140 N.Y.S. 453 (1912): "There can be no doubt that a lawfully married woman, a widow, or a woman who obtains a divorce, may be chaste and actually virtuous. Lawful matrimony or lawful wedlock cannot be said to deprive a good and pure woman of chastity and virtue."

Prior to the enactment of § 461A, the law of Maryland in this regard was as stated in *Humphreys v. State,* 227 Md. 115, 121 (1961):

> "It is well established that there is no requirement that the victim of the crime of rape be chaste, so far as the common law is concerned.... However, the general character of the prosecutrix as to chastity or unchastity is admissible in the majority of common law jurisdictions, including Maryland, because of its probative value in determining whether the act was committed with or without her consent, a necessary element in the common law crime of rape."

Although evidence as to specific acts of sexual intercourse was held to be inadmissible, and the Court of Appeals, and this Court, when given the opportunity, did attempt to limit somewhat the kinds of questions that might be asked,[10] nonetheless, a rape victim, in addition to all of the other indignities heaped upon her in the investigatory process, was subjected, in court, to having the trial center as often on her reputation for chastity as on the question of whether the defendant committed the acts alleged. In line with the concept expressed in *Humphreys v. State, supra,* it has been held (75 C.J.S. *Rape,* § 63):

> "In order to show the probability of consent, the general reputation of prosecutrix for immorality and unchastity and her general immoral habits and character may be shown, as by showing that she was a common prostitute, generally promiscuous, or drunken and dissipated.... Evidence that prosecutrix bore the general reputation of being unchaste and had habitually engaged in acts of sexual intercourse with others is admissible on behalf of accused to support his contention that her

---

10. *See* Shartzer v. State, 63 Md. 149 (1885); Giles v. State, 229 Md. 370 (1962), *app. dismissed,* 372 U. S. 767 (1963); Johnson, Jr. v. State, 232 Md. 199 (1963); England and Edwards v. State, 21 Md. App. 412 (1974).

physical condition was not due to rape but to a drunken fight in which she participated."

This, then, was the background of House Bill 715 (Laws of Md., 1976, ch. 574). Notwithstanding the inadmissibility of evidence as to specific acts of sexual conduct (or misconduct) with men other than the accused, it was, to a point, open season on the victim's general reputation in the community for chastity and virtue. The legislative history of House Bill 715, other than that recorded above, is scant. There was, however, an identical bill introduced in the Senate (Senate Bill 399).[11] That bill was heard before the Senate Judicial Proceedings Committee in conjunction with Senate Bill 358, which, as noted, sought (at that stage of the legislative process) to repeal the crime of rape and substitute four degrees of sexual offense, of which men and women could be both perpetrator and victim. The Report of the Judicial Proceedings Committee makes clear, however, that, despite the reference in Senate Bill 399 to prosecutions for sexual offenses, the concern of the sponsor, those supporting the bill, and the committee itself was with the victims of rape.[12]

---

11. Both bills emanated from the Special Committee on Rape and Related Offenses, and, in their first reader form, were identical. Senate Bill 399 was introduced by Senator Hoyer, House Bill 715 by Delegate Sheehan, both of whom were members of that Special Committee. Both bills were amended in exactly the same way and were passed in identical fashion. Faced with duplicate bills, the Governor signed House Bill 715 and vetoed Senate Bill 399 at the request of Senator Hoyer.

12. The testimony offered in support of the bill, as summarized in the Committee Report, is replete with references to rape and the victims of rape, and, in contrast, omits any references to the victims of any other forcible sexual offenses. The Report concludes:

"In its deliberations, the Committee took cognizance of the broad based support of the concept of limiting evidence relating to prior sexual conduct of a *rape victim* and that such a limitation would probably result in an increase in the percentage of *rapes* reported; that a statutory response to the inherent sensitivities of a traumatized victim could accommodate the constitutionally mandated rights and protections properly afforded a defendant in our criminal justice system; and that the weighing of inflammatory nature *versus* the probative value of evidence of specific instances of prior sexual conduct precludes possible admission of highly prejudicial evidence of limited probative value. Presently, it is the practice of some courts to admit evidence of any probative value irrespective of its inflammatory nature." (Emphasis supplied.)

Such emphasis was neither inadvertent nor misplaced, considering the purpose of the bill and the nature of the problem it was designed to correct. Notwithstanding that in its then-current form, the bill would have applied to all sexual offenses (and thus would have had a broader application than the 1977 amendment), its thrust and intention was to correct a more limited "evil". As noted, it was not men whose chastity was exposed to public inquiry, but women; and it was neither their general mores nor their sexual preferences that were examined, but rather their reputation for being willing and amenable to engage in sexual intercourse with men.

Although proof that a "prosecutrix" had previously been convicted of a perverted sex practice may have been admissible as bearing on her general credibility, evidence offered by a male defendant in a rape case to the effect that the victim had a reputation for being a lesbian — that she preferred women to men as sexual partners — would have been entirely irrelevant to the question of consent and therefore inadmissible. Consequently, this type of evidence was rarely, if ever, offered, and was not at all the problem to which this legislation was directed. Indeed, we are aware of no instance in which an appellate court of this State has concluded that a rape victim may be subjected to such an inquiry; nor are we aware of any evidence that those who sponsored and supported reform measures, such as the legislation before us, were concerned with that type of inquiry. The use of the word (and concept of) "chastity" in the debates and literature pertaining to these reform measures has nearly always been in the context of the prior heterosexual activity of a female victim of a male assault. That was the "evil" to be remedied.[13]

The reform effort in Maryland was not unique. In enacting ch. 574 (1976) and ch. 294 (1977), the General Assembly was following a nationwide trend, a trend of which it was well

---

**13.** *See Privacy of Rape Victims,* Hearing Before House of Representatives Committee on the Judiciary, Subcommittee on Criminal Justice, July 29, 1976; Report of the National Commission on the Observance of International Women's Year (1976), pp. 261-266; *Sexual Assault: Confronting Rape in America,* Gager and Schurr, pp. 151-157; *Reform Rape Legislation: A New Standard of Sexual Responsibility,* 49 Colorado L.R. 185 (1978); *Kentucky Rape Statute,* 4 N.Ky.L.R. 345 (1977).

aware.[14] Significantly, similar proposals in both the Congress and in other State legislatures, some of which, at the time, had already been enacted into law, discarded the word "chastity", and fashioned the exclusionary rule around evidence pertaining to the "past sexual behavior" or the "prior sexual conduct" of the victim.[15] Indeed, this appears to be the nearly universal approach taken in statutes analogous to § 461A.

The Maryland General Assembly, even when extending the scope of § 461A to sex offenses other than rape, chose not to paint with such a broad brush, but continued instead to restrict the application of the exclusionary rule to evidence relating to the victim's "chastity", in the context, we must presume, of its then-current use and meaning.[16] The deliberateness of this approach is particularly evident from its use of the terms "prior sexual conduct" and "past sexual conduct" in the very same section, but only in the context of the limited exclusion of evidence as to "specific instances".[17]

14. This is reflected, in part, in the minutes of the Special Committee on Rape and Related Offenses for the meeting of July 7, 1975, and by a document prepared by the Governor's Commission to Study Implementation of the Equal Rights Amendment, dated July, 1975, and entitled "Rape Law Comparison for Selected States."

15. *See, for example,* HR 14666, HR 12684, HR 12685, HR 12968, HR 13481, HR 15739, HR 15740, all being proposals to amend the Federal Rules of Evidence introduced in the 94th Congress; HR 408, S 1422, S 1111, similar bills introduced in the 95th Congress; Cal. Penal Code, §§ 1127d, 1127e; Cal. Evid. Code, § 1103; Mich. Stat. Annot., § 28.788(10); N.Y. Crim. Proc. Law, § 60.42; Purdon's Pa. Stat. Annot., Title 18, § 3104.

16. As noted earlier (footnote 7), the General Assembly had been entreated on several occasions, including in the 1976 session that produced § 461A, either to repeal or to extend to both sexes the tort of "slander of chastity". *See* SB 207, HB 886 (1976 session). The use and meaning of that term was therefore not unknown to the lawmakers.

17. *See* Report of the Senate Judicial Proceedings Committee on SB 399 (1976). Under the hearing "Arguments in Favor of Committee Action", the Report states:

"Under present Maryland law, specific instances of the victim's *past sexual conduct* are inadmissible unless the conduct was with the defendant. However, evidence of a victim's reputation for *chastity* is admissible if consent is a defense. Thusly, the substantive changes incorporated in the bill are the outright ban on evidence of reputation *for chastity* and the in chambers determination as to whether evidence of specific instances of *prior sexual conduct* is of such probative value as to outweigh its inflammatory or prejudicial nature. The evidence of specific acts must then also fall within one of the four enumerated categories which are presently part of the case law of this State." (Emphasis supplied.)

As § 461A (a) is worded, it may be the case (although we need not and do not decide the point here) that evidence, if it existed, of specific instances of homosexual activity on the part of Mr. D would have been admissible under the conditions laid down in that subsection; but that result would not obtain through a construction of the word "chastity".

In *Dept. of Tide. Fisheries v. Sollers,* 201 Md. 603 (1953), we are told that, where the language of a statute is fairly susceptible of more than one construction, "the Court may seek the legislative intention by considering the facts of contemporary history, the prior state of the law, and the particular evil, abuse or defect which the statute was designed to correct and the remedy which was intended." To the extent that there is an ambiguity in the meaning of the word "chastity", it is clear that the General Assembly intended it to refer (and be limited) to heterosexual contact only. Had it desired otherwise, it could and would have so provided, as other legislatures have done.

Accordingly, we do not believe that Sgt. Luberecki's testimony related to his nephew's "chastity", and for that reason it would not have been inadmissible under § 461A as it presently reads.

*Judgments affirmed; appellant to pay the costs.*