594 A.2d 1190

**ENVIRO–GRO TECHNOLOGIES, et al.**

**v.**

**Gary BOCKELMANN, et al.**

**Nos. 1624, 1625, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

Sept. 5, 1991.

324

Warren K. Rich (Sharon K. Tucker and Rich, Tucker & Rice, on the brief), Annapolis, for appellants.

Charles M. Preston (Stoner, Preston & Boswell, Chartered, on the brief), Westminster, for appellee, Bockelmann.

Charles W. Thompson, Jr., Westminster, for appellee, County Com'rs of Carroll County.

Argued before WILNER, C.J., and ROSALYN B. BELL and CATHELL, JJ.

CATHELL, Judge.

We are again called upon to provide an appellate review of a zoning case arising out of the application of the Carroll

County Zoning Ordinance. We have in this term, alone, provided that review for at least three prior cases: *County Comm'rs of Carroll County v. Zent,* 86 Md.App. 745, 587 A.2d 1205 (1991); *County Comm'rs of Carroll County v. Wisner* [No. 1140, 1990 Term, per curiam, filed May 7, 1991]; *Carroll County v. Brothers* [No. 1141, 1990 Term, per curiam, filed May 16, 1991]. In *Zent,* we recognized that the situation there in controversy arose out of the emerging suburban character of the county. The present issue involves the problems created by the desire to dispose of urban sewage sludge by utilizing it in land application on Carroll County farms. This is alleged to be justified as an "agricultural practice."

## Facts

A facility for the storage of 13,500 tons of municipal sewage sludge was constructed on Robert Neal's farm in Carroll County. No building permit or conditional use was obtained. Thereafter, on March 13, 1989, the zoning administrator notified the appellants, Enviro–Gro Technologies, Inc. et al. (Enviro), that the facility violated the zoning ordinance and directed the stoppage of any further work or utilization of the facility absent zoning approval. An appeal was noted to the Carroll County Board of Zoning Appeals (BZA).

After a hearing, the BZA rendered a decision. Among its factual determinations were the following *findings of fact*:

[T]hat the application of sludge to agricultural lands is an accepted agricultural practice....

[T]he purpose of the pit is to hold sludge which must be taken from a waste treatment plant and stored until it can be applied to the land....

[T]he Board finds as a fact that the purpose of the pit is not agricultural use.... [T]here is no agricultural use associated with its storage. Rather, the pit is more properly simply a link in the chain of sludge transport and eventual disposal.... The existence of the pit responds not to a constant need for fertilizer on the Neal

farm but to a fact of urban life—sewage treatment facilities generate sludge on a 24 hour basis and it must be removed continuously.

[T]he Board finds as a fact that it [sludge] is not fertilizer.... [S]ludge does not have a controlled analysis.... [T]he sludge storage pit is not a facility for the storage of liquid or dry fertilizer. Sludge has some of the properties of fertilizer, but it is not fertilizer as such. It is sludge.

Sludge causes an odor. The ... Board smelled the sludge when they visited the facility [pit].... Many of the protestants testified about the strong odor from the property.... [T]he Board finds as a fact that the sludge in the pit does cause an odor.... [T]he Board relies upon the testimony of Martha Hinson, the section head of the sewage sludge division of the Department of the Environment.... The Board accepts her testimony and finds as a fact that there is a stronger odor from a pit than from sludge spread on the fields.

\*     \*     \*     \*     \*     \*

[T]he sludge pit takes on the character of a step in the chain of sludge disposal; and the ... pit allows Enviro–Gro to meet its commitment to remove sludge from municipal facilities on a regular basis.

\*     \*     \*     \*     \*     \*

[I]t is a very large facility.... [I]t is a very major facility having a constant and immediate inter-action with the surrounding neighborhood.... [T]hese are not major incidents, but demonstrate the close quarters in which the residents ... live and the immediate impact which the sludge operation has on them.

The Board finds as a fact that this is not a suitable site for such a large scale facility.

The BZA then concluded that the sludge pit was not an accessory agricultural use, because it was part of a sludge handling operation, and that its storage of sludge was not for an agricultural purpose as defined in the ordinance. It

also concluded that it was not qualified to be a conditional use under the provisions permitting storage of fertilizer, because the sludge was not fertilizer as contemplated by the ordinance. It further stated that, even if the sludge *was* fertilizer, its storage did not qualify as a conditional use. The BZA then affirmed the administrative action except to reverse that official's determination that a sludge pit qualifies for a conditional use consideration.[1]

On appeal to the Circuit Court for Carroll County, the court found:

> First, the sludge storage ... fails to satisfy the "customarily incidental" requirement of Art. 6, Sec. 6.4, and is not, therefore, an accessory use. Second, because the BZA found that sludge application serves an agricultural purpose and Art. 1, Sec. 4.5, restrains the outright prohibition of "structures incident to the use for agricultural purposes ...", the sludge storage pit must be viewed as a conditional use under Art. 6, Sec. 6.3(r). Lastly, the BZA's "shotgun approach" to decision-making was both unsatisfactory and inadequate.... [Footnote omitted.]

It then ordered a remand in order for the BZA to make the complete and specific findings it said were mandated by Art. 17, § 17.7.

Enviro appeals and raises two questions:

1. Did the Circuit Court err in finding that the storage of sewage sludge, to be used for agricultural purposes, is not a permitted use in the Agricultural District under the Carroll County Zoning Ordinance?

2. Did the Circuit Court err when it held that farm storage of sewage sludge, to be used for agricultural purposes, is not an accessory use in the Agricultural

---

1. We shall not address the BZA's findings on the conditional use issue, for reasons which will become apparent.

District under the Carroll County Zoning Ordinance? [2]

Although we do not agree with some of its reasoning, we perceive no error in the trial court's findings as to those two questions.

Appellees/cross-appellants, Gary Bockelmann et al. (Bockelmann), argue on cross appeal that the appellants abandoned their request for a conditional use for the purpose of maintaining a storage pit for municipal sewage sludge. They also argue that, even if the appellants had not abandoned that application, the trial court erred in ruling that the BZA's findings were insufficient to justify the denial of the conditional use application. We find it unnecessary to address these two issues.

Did the Circuit Court err in *finding* that the storage of sewage sludge, to be used for agricultural purposes, is not a *permitted or accessory* use in the Agricultural District under the Carroll County Zoning Ordinance?

It is undeniable that the process of sewage treatment by which sludge is created is not an agricultural process. While it can be argued that not all land applications of sludge are for agricultural purposes, it appears that land application of sludge on Robert Neal's property is, at least in part, for an agricultural purpose.

The issue before the BZA and the trial court was to determine at which point, during the process from one extreme to the other, sludge lost its identity as a sewage by-product needing disposal and gained a new identity as an element of an agricultural use. That issue was a matter of fact.[3]

---

2. Enviro appeals the circuit court's decision. For different reasons, the BZA had also held that the pit was not a permitted or accessory use.

3. The trial court agreed with the appellant that the issues it was reviewing were legal, not factual matters; it was, to a large extent, incorrect. For example, whether agricultural uses are, or are not, permitted is a matter of statutory interpretation; *i.e.*, a matter of law. Whether a new process is, or is not, an agricultural utilization or at

The BZA, in essence, determined that sludge retained its character as a sewage by-product until it was applied to fields for agricultural purposes; and that storage pits as such, and the Enviro pit in particular, served the primary purpose of responding to the continuous need for sludge removal from sewerage systems rather than the need for agricultural applications. Thus, the BZA found that the sludge storage at issue was *not yet* a permitted or accessory agricultural use. The trial court's opinion, although somewhat unclear, did affirm that part of the BZA's opinion, albeit upon different reasoning.

We said in *Harford County v. McDonough,* 74 Md.App. 119, 122, 536 A.2d 724 (1988):

> The order of an administrative agency, such as a county zoning board, must be upheld on review if it is not premised upon an error of law and if the agency's conclusions on questions of fact or on mixed questions of law and fact are supported by substantial evidence presented to it.

The Court of Appeals in *Bd. of County Comm'rs v. Holbrook,* 314 Md. 210, 218, 550 A.2d 664 (1988), referring to the standards for special exception grants outlined in *Schultz v. Pritts,* 291 Md. 1, 432 A.2d 1319 (1981), said:

> The *Schultz* test accords with the general standard for judicial review of the ruling of an administrative agency,

---

what point in a process it transmutes, however, is a matter of fact. The major portion of the case at bar involved factual determinations as to what was or was not agricultural, not an application of the law to a concededly agricultural utilization. In *Kassab v. Burkhardt,* 34 Md.App. 699, 368 A.2d 1064 (1977), it was conceded that a certain utility did not exist, and that the ordinance required its existence prior to the grant of a special exception. The BZA interpreted the ordinance to mean something different; it was, thus, a matter of law. *Harford County v. McDonough,* 74 Md.App. 119, 536 A.2d 724 (1988), involved the conceded abandonment of a non-conforming use for the requisite period. The zoning administrator nevertheless concluded that it was not abandoned pursuant to the terms of the ordinance; it was, again, a matter of law. The primary issue in the case *sub judice* is not whether agricultural practices are permitted, but if and at what point a practice becomes agricultural. That is a factual determination.

which we have defined as "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached; this need not and must not be either judicial fact-finding or a substitution of judicial judgment for agency judgment." *Supervisor of Assess. v. Ely*, 272 Md. 77, 84 [321 A.2d 166] (1974).

\*      \*      \*      \*      \*      \*

Therefore, due deference must be given to the right of an administrative agency, such as the Cecil County Board of Appeals, to draw reasonable inferences from the facts and circumstances presented before it.

Additionally, the Court of Appeals said in respect to the treatment of factual inferences:

"The heart of the fact finding process often is the drawing of inferences from the facts. The administrative agency is the one to whom is committed the drawing of whatever inferences reasonably are to be drawn from the factual evidence. The Court may not substitute its judgment on the question whether the inference drawn is the right one or whether a different inference would be better supported. The test is reasonableness, not rightness.'" (Citation omitted.)

*Holbrook*, 314 Md. at 218, 550 A.2d 664 (quoting *Snowden v. Mayor of Baltimore*, 224 Md. 443, 448, 168 A.2d 390 (1961)).

■ We shall now examine the factual record, as contained in the extract, to determine if the BZA's factual findings are sufficiently supported, keeping in mind that "if the evidence makes the issue ... fairly debatable, the matter is one for the Board's decision, and should not be second-guessed by an appellate court." *Holbrook*, 314 Md. at 218, 550 A.2d 664.

■ The BZA's findings primarily relate to the sewage sludge pit being part of the sewage disposal process, not an agricultural practice. Mr. Pepperman, the appellant's project manager, testified that land application of sludge

served an agricultural purpose. In reference to sludge management, however, he testified that:

> Sludge is produced by ... municipal agencies. They enter into contracts with us ... to take their sludge from the waste water treatment plant and manage it in an environmentally sound manner, which we do through land application or other processes that we offer.

> \* \* \* \* \* \*

> We have a proprietary process that heat dries sludge and creates a marketable product for use in the fertilizer industry....[4]

> \* \* \* \* \* \*

> It means that it is utilized in the preparation of fertilizer blends, commercial fertilization blends.

Mr. Pepperman also testified that in emergency situations, sludge which was originally to be applied elsewhere was to be delivered to the Neal farm. Thus, an inference could be made that the primary compelling factor for the storage at the Neal pit was Enviro's need for storage, not Neal's need for sludge.[5] For example, he stated at one point that the pit would be utilized "[w]hen the weather or field conditions are such that we cannot go on to agricultural application sites of any of our locations." At another point, he was asked, "Now ... it would be a fair statement, would it not, to say that you are going to put sludge in the storage pit on the Neal farm if weather conditions don't permit application on farms other than the Neal farm?" He responded, "That's correct." He also testified that Enviro was under

---

4. The sludge to be stored in the pit at issue was not heat dried and thus was not intended for that type of use in the "fertilizer industry."

5. Although the sludge, once placed in the pit, was used only on Robert Neal's property, the evidence showed that, because of the inability to spread sludge during inclement weather, sludge that was destined elsewhere was placed in the pit when it could not be delivered to its intended destination. The pit's capacity was 13,500 tons. The total that could be applied at the Neal property was 14,000 tons per year. Thus the filling of the pit just once a year would completely satisfy the application capacity of the Neal land for which permits existed.

contract to take and remove a certain amount of sludge from sewerage plants equalling the plants' daily production. Mr. Pepperman also testified that Enviro's business was "[t]he management of the sludge," and that the land application of the sludge was paid for by Enviro. There was no evidence that Enviro was involved in any agricultural business.

In letters to the county, Enviro, referring to an emergency situation and the county's stop work order, responded: "Enviro–Gro has entered into contracts with municipalities which require Enviro–Gro to acquire storage facilities to be used when rain and frozen ground prevent application of manure/sludge to the Neal Farm ... Enviro–Gro requires the storage space immediately to fulfill outstanding contracts [with sewerage plants]." George Wilson, another witness for appellants, testified on cross-examination that septic systems and sludge processes at issue in the case at bar were both "parts of systems designed to process our waste waters." He was asked: "Well, you would conclude then that a sludge storage pit is, in fact, part of our sewage treatment system?" He responded affirmatively. He also responded that he agreed generally with a publication which stated, "sludge storage facilities and their use should be considered as a part of sewage treatment, posing engineering and monitoring problems that vary greatly." [6]

Additionally, the evidence was uncontradicted that Enviro pays $100 per month for the right to maintain the Neal storage facility, and the Neals considered the pit to be Enviro's property.[7]

It was, thus, fairly debatable that the pit was part of Enviro's operation. Enviro was involved in sewage treatment, not in the business of agriculture. Additionally, it is

---

6. He also agreed, as did other witnesses, with the statement that "part of sewage treatment is the agricultural usage of sludge."

7. While zoning ordinances normally are concerned with usage, not ownership, ownership may be relevant evidence to the use of property, especially when the "owner" is conducting a specific business such as sewage sludge disposal.

apparent that inspections of sludge storage pits are conducted by the Department of the Environment, Hazardous and Solid Waste Management Administration,[8] not by the Maryland State Department of Agriculture. While certainly not conclusive, this is an indication that the State primarily considered the pit (and probably land application as well) as part of a sewerage system.[9]

Additionally, it appears that a distinction is made between the process involved with sewage disposal and farm-generated manure disposal. From the testimony, it appears that agriculturally generated manure is regulated through a separate program, the "Agricultural Waste Management Practices Approval," which involves the Soil Conservation Service's extension agents under a separate program partially financed through "a federal state agricultural pollution maintenance program." This process was further described by Mr. Chicca as an "agricultural approval program," which contrasts with the wealth of evidence establishing that sludge pits, generally, and the Neal pit, specifically, involved sewage treatment approval programs. Mr. Chicca also testified that, generally, farm-generated manure handling does not require a permit, in contrast with sludge handling, which does.[10]

Mr. Chicca and Ms. Hyson also testified that land application is only one of several methods of sludge disposal; *i.e.*, it is not purely an agricultural land application process.

---

**8.** According to one of Enviro's witnesses, Mr. Chicca, the County Health Office (a State office) also has an inspection function.

**9.** Mr. Chicca, however, also identified the process as agricultural. At one point he testified, "we believe that the primary responsibility falls on the sludge generators, okay to store, but we can certainly understand in an agronomic program the benefits to be derived by storage on the farm.... So you know you can make arguments one way or the other." If arguments can be made one way or the other, they can be considered to be fairly debatable.

**10.** Mr. Chicca testified that of "several thousand animal waste storage facilities ... possibly a dozen [require permits]," and that all activities involving sludge that occur off the premises of a sewerage facility require permits.

■ The standard of review used in zoning matters is that "the action of a zoning board will not be reversed on appeal if there is 'substantial evidence' in the record to support the board's finding." *Zent,* 86 Md.App. at 752, 587 A.2d 1205 (quoting *Neuman v. Mayor of Baltimore,* 23 Md.App. 13, 325 A.2d 146 (1974)). *See also People's Counsel v. Mangione,* 85 Md.App. 738, 584 A.2d 1318 (1990). As we said in *Mangione,* when reviewing the trial court's ruling, we apply a "clearly erroneous" standard to its findings of fact and apply an "abuse of discretion" standard to its application of the law to the facts. In zoning cases, the "clearly erroneous" standard has been described as akin to, if not identical with, the "fairly debatable" rule. *Largo Civic Ass'n v. Prince George's County,* 21 Md.App. 76, 318 A.2d 834 (1974).

The BZA found that the sludge from sewerage plants stored in the pit was still a part of the sewage treatment process, not yet sufficiently identified with agriculture to be considered a permitted/incidental or accessory agriculture practice.[11] While there was evidence both supporting and negating the findings of the BZA and the trial court's findings, that evidence which we have discussed was sufficient to make the BZA's decision correct. To the extent that the trial court disagreed with the BZA's finding that the sludge storage in question here was a stage of sewage

---

**11.** We discuss herein that evidence before the BZA which primarily supported its decisions. We have, of course, reviewed all the evidence. We are mainly concerned with the sufficiency of that evidence which renders the BZA's conclusion fairly debatable. In *Terranova v. Bd. of Trustees,* 81 Md.App. 1, 566 A.2d 497 (1989), *cert. denied,* 319 Md. 484, 573 A.2d 808 (1990), we emphasized a portion of our opinion in *Comm'r v. Cason,* 34 Md.App. 487, 368 A.2d 1067, *cert. denied,* 280 Md. 728 (1977): "If there was evidence of the fact in the record before the agency, no matter how conflicting, or how questionable the credibility of the source of the evidence, the court has no power *to substitute its assessment of credibility for that made by the agency, and by doing so, reject the fact."* *Terranova,* 81 Md.App. at 12, 566 A.2d 497. (Emphasis in original.) We concluded in *Terranova,* at 13, 566 A.2d 497, that "[t]he weighing of the evidence and the assessment of witness credibility is for the finder of fact, not the reviewing court."

disposal prior to its transmutation to agricultural use, it erred.[12]

The Court of Appeals, in a case involving a denial of a use permit, stated: "It is a clearly established rule in the law of zoning that a court may not substitute its judgment for that of the Zoning Board." *Dorsey Enterprises v. Shpak,* 219 Md. 16, 23, 147 A.2d 853 (1959). *See also Largo Civil Ass'n, supra,* 21 Md.App. 76, 318 A.2d 834. We, in discussing the law relative to rezoning, have stated that the courts may not substitute their judgment for that of the legislative agency, if the issue is rendered fairly debatable. *Anne Arundel County v. Maryland Nat'l Bank,* 32 Md.App. 437, 440, 361 A.2d 134 (1976). *See also Tennison v. Shomette,* 38 Md.App. 1, 5, 379 A.2d 187 (1977), *cert. denied,* 282 Md. 739 (1978); *Fitzgerald v. Montgomery County,* 37 Md.App. 148, 153, 376 A.2d 1125, *cert. denied,* 281 Md. 737 (1977), *cert. denied,* 439 U.S. 854, 99 S.Ct. 164, 58 L.Ed.2d 160 (1978) ("[i]t is fundamental that court review of actions taken by the zoning authority is narrow and restricted in scope.") The basic reason for the "fairly debatable" rule is that zoning matters are, first of all, legislative functions and, absent arbitrary and capricious actions, are presumptively correct if based upon substantial evidence; even if substantial evidence to the contrary exists. The zoning agency, in this case, the BZA, not the court, is considered to be the expert in the assessment of the evidence. *Prince George's County v. Meininger,* 264 Md. 148, 154, 285 A.2d 649 (1972); *Brouillett v. Eudowood Shopping Plaza, Inc.,* 249 Md. 606, 241 A.2d 404 (1968); *B.P. Oil, Inc. v. County Bd. of Appeals,* 42 Md.App. 576, 577, 401 A.2d 1054 (1979).

---

**12.** Appellants, in their reply brief, correctly state that "[t]he Court found that the farm storage of sludge is an agricultural use." The court's ruling conflicted with the BZA's finding that storage was not an agricultural use, though some land applications might be. As we have held that the BZA's findings were appropriate, and the court's finding to the contrary was in error, appellants' reply argument is inapplicable.

The BZA, in the case *sub judice*, had to determine at what stage, in the evolutionary process of the transformation of human waste to agricultural product, the transformation was completed. Obviously, it is not an agricultural product at the time of its initial appearance. It concededly requires extensive treatment before it can even be considered for agricultural application. When being so considered, the sludge's constituent elements, such as metals, bacteria, nutrients, chemicals, etc., must be measured. Then its ultimate agricultural application is permitted, prohibited, and/or regulated based on its composition.

Even when it finally is rendered as sludge, it does not automatically assume an agricultural identity, as much of the sludge so produced is apparently unsuitable for agricultural purposes due to its content or for other reasons. Some is further processed for ultimate inclusion as a constituent element of fertilizer; some is incinerated; and some is dumped in landfills. Even when the land application disposal method is utilized, the sludge may be applied either as an agricultural practice *or* as a *sludge disposal* practice. When used in mine reclamation, it would be part of the mining process, not an agricultural practice, even though it was used as a nutrient.

The BZA, as we perceive its findings and conclusions, determined that the actual application of approved sludge to farms, when applied *as a soil nutrient*, was an agricultural application. That finding, as we see it, did not negate its other finding that sludge storage pits, generally, and this pit, specifically, were part of a sewerage system. The two findings, given the necessity for determining a point where the character of sludge changes, were not in conflict, and the trial court's ruling to the contrary was error. We thus hold that, under the facts of this case, the BZA's finding that the storage pit was not incident to an agricultural practice was supported by substantial evidence; its decision was fairly debatable.

The trial court, as we have said, erroneously rejected the BZA's findings; it, nevertheless, found that the storage of

sewage, generally, was neither a permitted nor accessory use under the Carroll County ordinance. Thus, albeit for different reasons than advanced by the BZA,[13] it found that the storage pit was not permitted. The BZA's finding that the storage pit was not a part of an agricultural function was supported by the evidence. Thus, although we disagree with the trial court's reasons, we affirm its ultimate decision on the two issues raised by appellant.

> [W]here the record in a case adequately demonstrates that the decision of the trial court was correct, although on a ground not relied upon by the trial court and perhaps not even raised by the parties, an appellate court will affirm.

*Robeson v. State*, 285 Md. 498, 502, 403 A.2d 1221, *cert. denied*, 444 U.S. 1021, 100 S.Ct. 680, 62 L.Ed.2d 654 (1979).

## The Conditional Use Issues

■ Appellants inform us in their reply brief of the enactment of a new zoning ordinance that would, if applicable, prohibit the conditional use at issue. They cite several cases in support of their assertion that the new ordinance

---

13.  As we have stated, we construe the BZA's finding to be: (1) that the land application of sludge for farming purposes is an agricultural use, and (2) that sludge storage and the storage facility, at issue here, under the facts of this case, were part of a sewerage system. These two findings are not necessarily contradictory, and both are supported by substantial evidence before the BZA. The trial court erred when it based its opinion on the BZA's finding that the application of sludge on farms served an agricultural purpose and stated that the Carroll County ordinance prohibited the prohibition of sludge storage facilities. In so finding, the trial court missed the point of the BZA's decision; *i.e.,* that the sludge, when it is applied to farm fields for agricultural purposes, is an agricultural use; but that the *storage* of sludge, which is not yet being utilized in agriculture, serves the purpose of sewage disposal. The BZA's finding, that sludge stored in storage containments is often later used for non-agricultural purposes, is supported by substantial evidence. We also note that this pit belonged to Enviro, and the land upon which it was placed was rented by Enviro from Neal. If Enviro's argument to the BZA were accepted, these pits could be placed virtually anywhere in Carroll County as permitted uses, without being subject to any county approval process.

should not apply.[14]

We have reviewed *Maryland Board of Pharmacy v. Sav–A–Lot*, 270 Md. 103, 311 A.2d 242 (1973); *Feinberg v. Southland Corp.*, 268 Md. 141, 301 A.2d 6 (1973); and *Mayor of Baltimore v. Poe*, 224 Md. 428, 168 A.2d 193 (1961), all of which are cited in the appellants' reply brief as authority for the proposition that zoning is concerned with uses, not ownership. The appellants argue that these cases forbid the enactment of the new zoning ordinance which prohibits sewage sludge storage pits except on the grounds of sewerage facilities, because the ordinance conflicts with the trial court's decision.

There can be no question but that the legislative body intended to vitiate the trial court's findings. A legislative body's desire to negate a court's decision is not an unusual desire, and when that decision is properly negated, is legal and valid.

Enviro ignores the language of the new ordinance, which describes the "use" of sewage sludge storage, not its ownership. Enviro also disregards the BZA's finding that the use of sewage sludge storage pits was part of a sewerage system, and not an agricultural use. We have held that the BZA's findings were supported by sufficient evidence so as to make them fairly debatable. Most of the BZA's findings were based on use, not ownership. It held that the use of the pits served a sewage treatment purpose. We see no inherent validity problem with the interim ordinance and, further, note that its "comments" as to the BZA's findings in the case at bar are more akin to our holding than to the trial court's findings.

---

**14.** Appellees have filed motions to dismiss the entire appeal on ground of mootness created by the enactment of the new ordinance. They also argue that the use has been abandoned and thus cannot be a nonconforming use under the new ordinance. Appellants respond that the use has not been abandoned but its utilization was stayed because of this litigation. Except for the bald assertion in appellee's motion, the record is completely devoid of any evidence of abandonment. For obvious reasons, we shall deny appellee's motion to dismiss.

In a case remarkably similar to the case at bar, the Court of Appeals dealt with a change in a zoning ordinance that occurred while the case was pending, but before the completion of appellate review. That court stated:

Maryland consistently has followed the rule that "an appellate court is bound to decide a case according to existing laws, even though a judgment rightful when rendered by the court below should be reversed as a consequence," ... (or, it may be noted, even when a judgment wrong when rendered is made right by the change in the law). See also for this proposition that a change in the law after a decision below and before final decision by the appellate Court will be applied by that Court unless vested or accrued substantive rights would be disturbed or unless the legislature shows a contrary intent....

*Yorkdale Corp. v. Powell,* 237 Md. 121, 124, 205 A.2d 269 (1964) (citations omitted).

As to whether substantive rights are acquired in a zoning process, the *Yorkdale* Court cited *Grau v. Bd. of Zoning Appeals,* 210 Md. 19, 122 A.2d 824 (1956); *Lake Falls Ass'n v. Bd. of Zoning Appeals of Baltimore County,* 209 Md. 561, 121 A.2d 809 (1956); *Banner v. Home Sales Co.,* 201 Md. 425, 94 A.2d 264 (1953), and then stated:

It would seem to follow from the decisions in *Banner, Lake Falls* and *Grau* that an applicant for rezoning to a more intense use of his property, *who has been successful* before the zoning authorities and the circuit court *does not acquire a vested* or substantive right which may not be wiped out by legislation which takes effect during the pendency in this Court of the appeal from the actions below. [Emphasis added.]

*Yorkdale,* 237 Md. at 126, 205 A.2d 269. In the instant case, the appellant was *unsuccessful. Yorkdale* was cited in the criminal case of *McClain v. State,* 288 Md. 456, 464, 419 A.2d 369 (1980), which involved a rule enunciated in *Johnson v. State,* 282 Md. 314, 384 A.2d 709 (1978), and that rule's application to the *McClain* case, which was also

pending at the time of the *Johnson* holding. Judge Smith, in discussing the history of the rule, said in *McClain* that:

In *Linkletter* [15] Mr. Justice Clark cited for the Court *United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1801), for the proposition "that a change in law will be given effect while a case is on direct review...." In *Schooner Peggy* Chief Justice Marshall concluded the opinion by saying for the Court, "[T]he court must decide according to existing laws, and if it be necessary to set aside a judgment, rightful when rendered, but which cannot be affirmed but in violation of law, the judgment must be set aside. *Id.* 5 U.S. [(1 Cranch)] at 110. *Id.* 288 Md. at 464, 419 A.2d 369.[16]

We, in *Miller v. Forty West Builders, Inc.*, 62 Md.App. 320, 489 A.2d 76 (1985), were, in part, concerned with a zoning amendment that occurred after approval by a County Review Group, but prior to the Board's consideration. We applied the *Yorkdale* rule, stating that "[a]ppellee did not acquire vested or substantive rights by obtaining C.R.G. approval of the subdivision plan," although we ultimately held that the particular language of the new statute foreclosed its application to that project. *Miller*, 62 Md.App. at

---

**15.** *Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965).

**16.** In *Washington Suburban Sanitary Com'n v. Riverdale Heights Vol. Fire Co.*, 308 Md. 556, 520 A.2d 1319 (1987), a case involving a newly enacted immunity statute, the Court, after acknowledging that *Thorpe v. Housing Authority of the City of Durham*, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969), adopted a broader reading of *Schooner Peggy*, stated, 308 Md. at 567, 520 A.2d 1319:

"The Court in *Thorpe*, however, observed that exceptions to the general rule that a court is to apply a law in effect at the time that it renders its decision 'had been made to prevent manifest injustice'...."

We know of no such exception to the rule laid down in *Schooner Peggy* and adopted in Maryland in *Yorkdale* (or before). We note that the Court of Appeals, while not applying the rule for reasons not relevant to the case at bar, in a footnote in *West Montgomery County Citizens Ass'n v. Maryland–Nat'l Capital Park and Planning Comm'n*, 309 Md. 183, 193, 522 A.2d 1328 (1987), cited *Yorkdale* for its retrospective holding.

330, 489 A.2d 76. *In Teays v. Supreme Concrete Block, Inc.*, 51 Md.App. 166, 441 A.2d 1109, *cert. denied,* 293 Md. 547 (1982), the Court of Appeals' decision in *Adler v. American Standard Corp.*, 291 Md. 31, 432 A.2d 464 (1981), had been filed after the Teays' trial court decision that had rejected a wrongful discharge cause of action, but before *Teays* reached us. We first stated that the trial court's decision had been correct when made, but then reversed and remanded based upon the concepts enunciated in *Adler* and *Yorkdale. See Grant v. Zich,* 53 Md.App. 610, 617, 456 A.2d 75 (1983). *See also Firstman v. Atlantic Constr. and Supply Co.,* 28 Md.App. 285, 345 A.2d 118 (1975), where Judge Orth reaffirmed the *Yorkdale* holding and *Lucado v. State,* 40 Md.App. 25, 31, 389 A.2d 398 (1978), where Judge Wilner, now Chief Judge, discussed the rationale of the rule saying: "The rationale behind this rule of retrospective application is that, provided no 'vested right' or contrary legislative intent is disturbed, it would be anomalous for a court to apply obsolete standards and issue a mandate that is inconsistent with current law." We, in *Lucado,* cited *Ziffrin v. United States,* 318 U.S. 73, 63 S.Ct. 465, 87 L.Ed. 621 (1943), and *Janda v. General Motors,* 237 Md. 161, 205 A.2d 228 (1964).[17]

Even if we were inclined to hold that the BZA had acted arbitrarily and capriciously in denying the appellants a conditional use, we would be constrained to uphold its denial, because the zoning ordinance now extant would, by its terms, prohibit such a conditional use. As Judge Pollitt,

---

**17.** *Janda's* fourth holding was expressly "disapproved" in *Riverdale Heights Fire Co., supra,* 308 Md. 556, 520 A.2d 1319, a case involving the application of an immunity statute. *Yorkdale* and the zoning and other cases we have cited were not overruled in *Riverdale Heights,* although the court's reasoning in rejecting *Janda's* "fourth rule" causes us some concern. We note, however, that it was somewhat limited to that factual situation, thus apparently not applicable to dissimilar factual cases. Due to the long and consistent body of law from *Schooner Peggy* to *Yorkdale* and subsequent thereto, we perceive that the *Yorkdale* rule still applies in zoning cases generally, and this case specifically, until overruled or disapproved by higher authority, or by the legislature.

formerly of this Court, opined in a *nisi prius* decision during his trial court years, "the government can legislate faster than the petitioner can litigate."

Accordingly, we hold that: 1) the trial court did not err when it held that the storage of sewage sludge was not a permitted or accessory use under the then-extant Carroll County zoning ordinance, although our affirmance is for different reasons than expressed by the trial court, *i.e.*, the decision of the BZA, being fairly debatable, was correct; 2) the new zoning ordinance adopted since the decision of the BZA and the circuit court's decision applies, and thus the sewage sludge storage pit at issue does not now qualify for conditional use consideration.[18]

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO THE CIRCUIT COURT FOR CARROLL COUNTY FOR THE ENTRY OF AN ORDER AFFIRMING THE DECISION OF THE BOARD OF ZONING APPEALS; APPELLEE'S MOTIONS TO DISMISS AND MOTIONS FOR SANCTIONS ARE DENIED; APPELLANT SHALL PAY THE COSTS.

---

**18.** While we thus do not address the sufficiency of the BZA's findings of fact in its denial of the conditional use under the then-existing ordinance, we note that generally, the standard for assessing findings of fact made by zoning agencies is not as stringent when an application is denied as when it is granted. *See Messenger v. Bd. of County Comm'rs,* 259 Md. 693, 271 A.2d 166 (1970); *Chesapeake Ranch Club, Inc. v. Fulcher,* 48 Md.App. 223, 230, 426 A.2d 428 (1981); *Fitzgerald v. Montgomery County,* 37 Md.App. 148, 156, 376 A.2d 1125, *cert. denied,* 281 Md. 737 (1977), *cert. denied,* 439 U.S. 854, 99 S.Ct. 164, 58 L.Ed.2d 160 (1978).